WILLIAM OLSTEN  9/3/2021

## Page 1

1          UNITED STATES DISTRICT COURT
2          EASTERN DISTRICT OF MISSOURI
3            EASTERN DIVISION
4
5
   RASHEEN ALDRIDGE,    )
6     Plaintiff,    )
                )
7    vs.         ) CASE NO. 4:18-cv-01677-CAS
                )
8    CITY OF SAINT LOUIS, et.   )
   al.,          )
9     Defendants.    )
10
11
12       VIDEO RECORDED DEPOSITION
13            OF
14         WILLIAM OLSTEN
15
16    Taken on Behalf of the Plaintiff
17
18         September 3, 2021
19

           *Olsten Exh. E*

        TAKEN VIA ZOOM
20
21
22   (Whereupon, the deposition commenced at 9:02 a.m.)
23
24
25

## Page 3

1          UNITED STATES DISTRICT COURT
2          EASTERN DISTRICT OF MISSOURI
3           EASTERN DIVISION
4
   RASHEEN ALDRIDGE,    )
5     Plaintiff,    )
              )
6    vs.        ) CASE NO. 4:18-cv-01677-CAS
              )
7    CITY OF SAINT LOUIS, et.   )
   al.,         )
8     Defendants.    )
9
10
11
12
13      Video Recorded Deposition of WILLIAM OLSTEN,
14 produced, sworn, and examined on the 3rd day of September,
15 2021, between the hours of 9:02 a.m. and 11:39 a.m. of that
16 day, via Zoom Videoconference before LEI ANN ODOM, Certified
17 Court Reporter No. 428, Registered Merit Reporter, Certified
18 Realtime Reporter, and a Notary Public within and for the
19 State of Missouri, in a certain cause now pending in the
20 United States District Court, Eastern District of Missouri,
21 Eastern Division, wherein RASHEEN ALDRIDGE is the Plaintiff,
22 and CITY OF SAINT LOUIS, et. al., are the Defendants.
23
24
25

## Page 2

1         I N D E X
2               PAGE:
3   Examination by Mr. Khazaeli.......................... 7
4   Examination by Ms. Duncan........................... 108
5   Reexamination by Mr. Khazaeli....................... 110
6
7
8
9
10
11
12
13
14
15       EXHIBIT INDEX
16       (None marked.)
17
18
19
20
21
22
23
24
25

## Page 4

1        A P P E A R A N C E S
2   REPRESENTING THE PLAINTIFF, RASHEEN ALDRIDGE:
3   JAVAD KHAZAELI ESQ.     (Appearing via Zoom)
   AARON BANKS, ESQ.
4   Khazaeli Wyrsch LLC
   911 Washington Avenue, Suite 211
5   Saint Louis, Missouri 63101
   (314) 288-0777
6   javad.khazaeli@kwlawstl.com
7   REPRESENTING THE DEFENDANT, CITY OF SAINT LOUIS, et. al. AND
   JOHN HAYDEN:
8
   ABBY J. DUNCAN, ESQ.     (Appearing via Zoom)
9   BRANDON D. LAIRD, ESQ.
   St. Louis City Counselors Office
10   1200 Market Street, Room 314
   St. Louis, Missouri 63103
11   (314) 622-4378
   duncana@stlouis-mo.gov
12   lairdb@stlouis-mo.gov
13   REPRESENTING THE DEFENDANT AND CROSS-CLAIMANT, WILLIAM OLSTEN:
14   BRIAN P. MILLIKAN, ESQ.     (Appearing via Zoom)
   Millikan Law Office LLC
15   12180 Old Big Bend Road
   Saint Louis, Missouri 63122
16   bmillikan@millikanlaw.com
17   ALARIS LITIGATION SERVICES:     (Appearing via Zoom)
18   VIDEOGRAPHER: KEITH MONTGOMERY
   COURT REPORTER: LEI ANN ODOM, CRR, RMR, Missouri CCR #428
19   711 North Eleventh Street
   St. Louis, Missouri 63101
20   (314) 644-2191
21
22
23
24
25

1 (Pages 1 to 4)



## WILLIAM OLSTEN  9/3/2021

### Page 5

1  IT IS HEREBY STIPULATED AND AGREED, by and among
2  counsel for Plaintiff and counsel for Defendants that the
3  deposition of WILLIAM OLSTEN be taken before Lei Ann Odom,
4  Certified Realtime Reporter, Registered Merit Reporter,
5  Certified Court Reporter No. 428 for the State of Missouri,
6  and thereafter caused to be reduced to print by means of
7  computer-aided transcription, and the signature of the witness
8  being waived.
9
10                    • • • • •
11
12  THE VIDEOGRAPHER:  We are on the record.  Today's
13  date is September 3rd, 2021 and the time is 9:02 a.m.
14  This is the video recorded deposition of William
15  Olsten in the matter of Rasheen Aldridge versus City of
16  St. Louis, et. al., Case No. 4:18-cv-01677-CAS in the
17  United States District Court, Eastern District of
18  Missouri, Eastern Division.
19  This deposition is being held remotely via Zoom
20  link.
21  The Reporter's name is Lei Ann Odom.  My name is
22  Keith Montgomery, I'm the Videographer.  We are with
23  Alaris Litigation Services.
24  Would the attorneys present please introduce
25  themselves and the parties they represent.

### Page 6

1  MR. KHAZAELI:  Javad Khazaeli and Aaron Banks for
2  the Plaintiff.
3  MR. MILLIKAN:  Brian Millikan for Defendant/
4  Cross-Claimant William Olsten.
5  MS. DUNCAN:  Abby Duncan for Defendant Hayden and
6  City of St. Louis.
7  THE VIDEOGRAPHER:  Would the Court Reporter please
8  read on the remote stipulation and then swear in the
9  witness.
10  THE COURT REPORTER:  This is Lei Ann Odom and I am a
11  Registered Merit Reporter and Certified Court Reporter.
12  I will be administering the oath and reporting these
13  proceedings remotely via Zoom videoconference.
14  Counsel, please indicate your individual agreement
15  to this manner of proceeding, after which I will swear in
16  the witness and we may begin.
17  MR. KHAZAELI:  Plaintiff's counsel so stipulates.
18  MR. MILLIKAN:  Olsten's counsel stipulates.
19  MS. DUNCAN:  Defendants City and Hayden so
20  stipulate.
21  THE COURT REPORTER:  Mr. Olsten, would you raise
22  your right hand.
23
24                    WILLIAM OLSTEN,
25  called as a witness by the Plaintiff, upon being duly sworn,

### Page 7

1  was examined and testified as follows:
2
3                    EXAMINATION
4  BY MR. KHAZAELI:
5  Q.  Good morning.
6  A.  Morning.
7  Q.  Have you ever been deposed before?
8  A.  Yes.
9  Q.  Okay.  So before we get started have you ever been
10  deposed on video before?
11  A.  I believe I have.
12  Q.  What about on Zoom?
13  A.  I think so.
14  Q.  Okay.  So just to go over just a few ground rules,
15  sometimes there's a little bit of a lag when stuff happens on
16  Zoom which increases the likelihood that we're going to talk
17  over each other.  When that happens it makes Lei Ann's job
18  very difficult so let's try, and I fail for this all the time,
19  let's try to make sure that I finish my answers before you
20  start to answer.  And also let's make sure, and I'll try to do
21  my best, to let you fully answer before I start to talk.
22  Okay?
23  A.  Yes.
24  Q.  The second thing is when we're dealing with
25  technology sometimes there are some issues.  If the screen

### Page 8

1  freezes in any way or if at some point you can't hear me,
2  we've been having internet issues in our building recently, we
3  can take a quick break or pause stuff.  Just let me know; I
4  don't want you answering any questions that you don't fully
5  understand.  Okay?
6  A.  Okay.
7  Q.  If I ever ask you a question that you do not
8  understand feel free to ask me to clarify.
9  Also if any of the other attorneys make any
10  objections, just because we've got that lag thing going on,
11  just let them speak so that we don't have a lot of overlap.
12  Okay?
13  A.  Okay.
14  Q.  Will you state your name for the record?
15  A.  William Olsten.
16  Q.  All right.  And I don't need your full address, Mr.
17  Olsten, but where, what city do you live in?
18  A.  Fenton, Missouri.
19  Q.  Where do you currently work?
20  A.  For Coatings Unlimited.
21  Q.  And what type of work is that?
22  A.  It's construction.
23  Q.  When did you first become a police officer?
24  A.  I was in the Academy in 2007 and commissioned as an
25  officer in June of 2008.

2 (Pages 5 to 8)

## WILLIAM OLSTEN  9/3/2021

### Page 9

1    Q.  Was that always with the St. Louis Metropolitan
2  Police Department?
3    A.  Yes.
4    Q.  Have you ever worked for any other police
5  departments?
6    A.  No.
7    Q.  Have you ever worked in the military?
8    A.  No.
9    Q.  So is it fair to say that the only police training
10  you've ever received is from the St. Louis Police Department?
11    A.  For the most part.
12    Q.  When you say for the most part, what does that mean?
13    A.  So I've gone to other trainings outside of the
14  Department that independent companies host, but for the major
15  training it's been through the Department.
16    Q.  Those other trainings that you went to, did you go
17  there as a member of the Police Department or were you doing
18  training --
19    A.  Yes.
20    Q.  -- for some kind of secondary?
21    A.  As a member, as the Police Department.
22    Q.  While you were at the Police Department did you ever
23  do any secondary security duty?
24    A.  Yes.
25    Q.  Who did you work for?

### Page 10

1    A.  It's been a long time.  I think I worked for The
2  Trophy Room.  I also worked for Bar 101.  And that's all I can
3  really remember right now, I'm not sure.
4    Q.  Did you ever work for any of those organizations
5  like The City's Finest or CGI or any of those other private
6  police forces?
7    A.  No.
8    Q.  So your secondary duty was like limited to working
9  at bars and restaurants?
10    A.  Yes.
11    Q.  Okay.  I'm going to take you back to the incident in
12  September 2017 at Busch Stadium.  Do you remember that
13  incident?
14    A.  Yes.
15    Q.  At that time what was the City of St. Louis's policy
16  on the use of chemical weapons?
17    A.  It was used as a non-deadly alternative to control a
18  combative or belligerent individual or to effect a lawful
19  arrest or to disperse a volatile crowd.
20    Q.  Do you remember you anything else about the specific
21  policy at the time?
22    A.  Just that it's to be used as an alternative to
23  physical contact and is to be used after verbal commands fail.
24    Q.  And what type of verbal commands?
25    A.  Any verbal commands that a lawful law enforcement

### Page 11

1  officer would give to an individual.
2    Q.  So you think any commands?  Are there any specific
3  commands in 2017 that a St. Louis police officer was supposed
4  to give before using a chemical weapon?
5    A.  Yes.  The command of get back or stay back was a
6  lawful command used.
7    Q.  Beyond that were there any other commands that a
8  police officer was supposed to use?
9    A.  I don't recall, sir.
10    Q.  Let's go to -- you said that you were in the Academy
11  in 2007.  What type of training did you receive in the
12  Academy?
13    A.  I received legal training, defensive tactics,
14  traffic enforcement.  Basically everything that's -- you're
15  going to be doing as a police officer.
16    Q.  Let's go through your legal training.  Give me a
17  brief summary of what your legal training was.
18    A.  They just go over state statutes and city ordinances
19  and department policies.
20    Q.  And why did you have to learn about city ordinances?
21    A.  To familiarize yourself with the laws of the city
22  you're going to patrol.
23    Q.  But why was that important for a police officer to
24  know?
25    A.  So you're not -- so you're enforcing the correct

### Page 12

1  laws when you're enforcing law.
2    Q.  So you'd agree with me that a police officer needs
3  to know the elements of a law before he can enforce it;
4  correct?
5    A.  Yes.
6    Q.  In September 2017 what were the elements of the St.
7  Louis ordinance for unlawful assembly?
8      MR. MILLIKAN:  I'm going to object just to the
9    extent that it calls -- could call for a legal
10    conclusion.
11      To the extent, Bill, that you know you can answer.
12    Q.  (By Mr. Khazaeli)  I'll ask the question again:  In
13  September 2017 what was your understanding of the elements of
14  the St. Louis ordinance for unlawful assembly?
15      THE WITNESS:  I'm sorry --
16      MR. MILLIKAN:  Same objection.
17      THE WITNESS:  I'm sorry, Javad.  Brian, I didn't
18    hear what you said there at the end.
19      MR. MILLIKAN:  Same objection.  Just you can -- you
20    can answer.  To the extent that you know.
21    A.  Okay.  As far as I knew we -- it was lawfully
22  assembled whenever the protest began.  At some point
23  throughout the incident it became unlawful.
24    Q.  (By Mr. Khazaeli)  How did it become unlawful?  What
25  made it unlawful?

3 (Pages 9 to 12)

## Page 13

1  A. There were assaults on law enforcement officers and
2  refusal to obey lawful commands.
3  Q. And for an unlawful assembly, is there a number of
4  people that need to be involved in any of this malfeasance for
5  it to be an unlawful assembly?
6  MR. MILLIKAN: I'm going to object again. Calls for
7  a legal conclusion.
8  To the extent that you know, Bill, you can answer.
9  A. Yeah, I'm not —
10  MR. KHAZAELI: Hey, Brian?
11  MR. MILLIKAN: Yeah.
12  MR. KHAZAELI: Brian, I'm going to ask a few
13  questions about different ordinances. You want to just
14  do a running objection?
15  MR. MILLIKAN: If that — that would be preferred as
16  long as you're okay with that.
17  MR. KHAZAELI: I'd prefer it that way too.
18  MR. MILLIKAN: Okay.
19  MR. KHAZAELI: Okay.
20  Q. (By Mr. Khazaeli) So Mr. Olsten, what that means is
21  that your counsel has a running objection about my not being
22  able to use this for legal conclusions but that you can still
23  go ahead and answer these to the best of your ability. Okay?
24  A. Okay.
25  Q. So let's go back to the unlawful assembly. Based on

## Page 14

1  your knowledge in September 2017 was there a — did the
2  ordinance require a certain number of people to be involved
3  for it to be an unlawful assembly?
4  A. I don't know an exact number.
5  Q. Based on your knowledge do you recall if the
6  ordinance required those people to do anything for it to be
7  considered an unlawful assembly?
8  A. I'm not sure.
9  Q. Okay. Now, back in 2017 what was your understanding
10  of the requirements for the St. Louis ordinance for impeding
11  traffic?
12  A. I knew that it was an ordinance to not impede
13  traffic. However, the Department was allowing it for the
14  protesters at this event.
15  Q. Okay. What — so let's go through your training.
16  Did you get any training at the Academy on Constitutional law?
17  A. Yes.
18  Q. What is your recollection of what you were trained
19  on regarding the Fourth Amendment?
20  A. The Fourth Amendment?
21  Q. Yes.
22  A. I don't remember exactly what the training was.
23  Q. What about the Fifth Amendment?
24  A. I don't remember exactly what the training was.
25  Q. What about the Sixth Amendment?

## Page 15

1  A. Again, I don't remember exactly what the training
2  was.
3  Q. What about the First Amendment?
4  A. I don't remember exactly what the training was.
5  Q. Do you remember any kind of training that you
6  received about Constitutional rights that people protesting
7  have?
8  A. It's been so long since the Academy, I'm not sure
9  exactly what training they gave us.
10  Q. Did you ever receive additional training while you
11  were an officer after you left the Academy?
12  A. Yes.
13  Q. And you were an officer for almost ten years, more
14  than ten years; correct?
15  A. Yes.
16  Q. So during your ten plus years of being an officer
17  what trainings do you remember about the Constitutional rights
18  of protesters?
19  A. I don't recall exactly what training the Department
20  gave. I would have to refer to training history.
21  Q. Sitting here today, though, do you remember any
22  aspects of those trainings?
23  A. Not off the top of my head.
24  Q. Do you think in September 2017 you would have
25  remembered specific aspects of those trainings?

## Page 16

1  A. It's possible.
2  Q. But you're not sure.
3  A. Not sure.
4  Q. Do you think in September 2017 you would have known
5  the specific elements of the ordinances I've asked you about?
6  A. It's possible.
7  Q. But you're not sure?
8  A. I'm not sure.
9  Q. Okay. Have you ever heard of a Federal case called
10  Templeton v. Dotson?
11  A. No, I have not.
12  Q. Were you — you were working at the Police
13  Department when the Michael Brown verdict came down; right?
14  A. Yes.
15  Q. Did you work in the protest during the Michael Brown
16  protest?
17  A. I was actually on vacation when that started but I
18  was up there for a couple days at the very end.
19  Q. Okay. Do you remember ever being told by anybody
20  within your chain of command that the policies regarding how
21  police regard — react to protests changed after the Michael
22  Brown case?
23  A. I don't recall.
24  Q. Do you remember any specific trainings after Michael
25  Brown but before the incident in this case where you were told

4 (Pages 13 to 16)

WILLIAM OLSTEN  9/3/2021

## Page 17

1  that St. Louis Police policies changed regarding the use of
2  chemical weapons?
3      A. I don't recall.
4      Q. Sitting here -- but sitting here today you can't
5  remember any of those; correct?
6      A. I don't remember if anything changed after --
7      Q. Okay.
8      A. -- that.
9      Q. Let's go to the incident did that night. After that
10 incident when was the first time that you were questioned
11 about what occurred on the night of the Busch Stadium protest
12 by anybody in law enforcement?
13     A. It would be a guess. I'm assuming it would be
14 after, you know, sometime after the event happened.
15     Q. Approximately how long?
16     A. I'm not sure, sir.
17     Q. Do you remember who spoke to you?
18     A. No.
19     Q. Do you remember if it was somebody with Internal
20 Affairs that spoke to you?
21     A. No.
22     Q. Do you know if it was somebody named Sergeant Wall,
23 W-a-l-l?
24     A. No.
25     Q. Do you recollect at all whether anybody ever spoke

## Page 18

1  to you?
2      A. I'm sorry. What was the question?
3      Q. Do you recollect at all if anybody ever interviewed
4  you about what happened that night who was a part of the St.
5  Louis Police Department?
6      A. I don't -- I don't recall who I spoke with after it.
7      Q. But when you recall -- but did you speak to
8  somebody, though?
9      A. I'm sure I did.
10     Q. Okay. Do you remember anything about that
11 interview?
12     A. Not off the top of my head. I'd have to --
13     Q. Let's go through --
14     A. I'm sorry.
15     Q. At the time -- sorry. Go ahead. Did I cut you off?
16 Go ahead and finish.
17     A. Yeah. I said not off the top of my head. I'd have
18 to refer to a police report.
19     Q. I'm talking about specifically any investigations
20 into your actions that night. Do you remember if IAD ever
21 spoke to you about your actions that night?
22     A. I don't believe they did.
23     Q. Okay. Do you remember if any Police Department
24 officers spoke to you about your actions that night?
25     A. If so it would've just been the author of the police

## Page 19

1  report.
2      Q. Okay. So you don't remember any officers talking to
3  you where they were investigating your actions that night?
4      A. No.
5      Q. Okay. Because I would assume, and tell me if I'm
6  wrong here, if somebody were to call you in and say, hey,
7  we're investigating you for criminal activities, what would
8  your first reaction -- what would the first thing that you do?
9  What would be the first thing that you would do?
10     A. I would contact my attorney.
11     Q. You would call the union or your attorney; correct?
12     A. Yes.
13     Q. Do you remember ever doing that with regards to this
14 case?
15     A. No.
16     Q. Okay.
17     MR. MILLIKAN: Well, I just want to make sure the
18 record's clear because at some point obviously, Javad, he
19 was charged so he did obviously contact someone then but
20 I just -- for the record --
21     MR. KHAZAELI: Let me clarify. I can clarify.
22     MR. MILLIKAN: Okay.
23     (By Mr. Khazaeli) Before you were criminally
24 charged were you ever approached by an investigator from the
25 Police Department?

## Page 20

1      A. No, I was not.
2      Q. Okay. What unit were you working with at the time
3  of the incident?
4      A. I believe it was the Special Operations Division.
5      Q. And who was your supervisor at that time?
6      A. My immediate supervisor was Eric Bartlett.
7      Q. He's a Sergeant; right?
8      A. Yes.
9      Q. Tell me about the Special Operations Unit. What
10 does the Special Operations Unit do?
11     A. So at that time our mandate was to basically go
12 after violent offenders who were committing gun crimes and
13 narcotics violations.
14     Q. Have you ever heard of the phrase the Jump Out Boys?
15     A. I'm sorry. What was that? You cut out.
16     Q. Have you ever heard of the phrase, the Jump Out
17 Boys? J-u-m-p O-u-t, the Jump Out Boys.
18     A. Yes, I have.
19     Q. And have you ever heard that phrase used to refer to
20 the Special Operations team?
21     A. It's possible.
22     Q. Have you ever heard that phrase being used for the
23 Special Operations Team?
24     A. It's possible.
25     Q. When you say it's possible, I'm trying to clarify.

5 (Pages 17 to 20)

**WILLIAM OLSTEN  9/3/2021**

## Page 21

1  Do you remember ever hearing anybody refer to the Special
2  Operations Team as the Jump Out Boys?
3      A.  I don't remember anyone specifically, no, sir.
4      Q.  But do you remember that ever happening?  I don't
5  need to know who the person was, but do you remember anybody
6  ever or ever having heard of the Special Operations Team
7  referred to as the Jump Out Boys?
8      A.  I don't remember.
9      Q.  Who was your partner with the Special Operations
10  Team in September of 2017?
11      A.  Officer Zajac.
12      Q.  Could you spell Zajac for the record?
13      A.  Z-a-j-a-c.
14      Q.  Do you still keep in touch with Officer Zajac?
15      A.  Yes.
16      Q.  Where is he currently employed?
17      A.  I believe he's still on the books for the Police
18  Department.  However, he's been out injured for a while and I
19  think he's going to be medically retired is what he's trying
20  to do.
21      Q.  So you believe that he's out on an injury, on an
22  injury leave; right?
23      A.  Yes.
24      Q.  And what do you think is going to happen?  What do
25  you believe is going to happen as a result of that?

## Page 22

1      A.  I believe he's trying to seek medical retirement.
2      Q.  Tell me what you know about medical retirement.
3      A.  Very little.
4      Q.  But just generally what happens when somebody gets a
5  medical retirement?
6      A.  Basically if they receive an injury while on duty
7  that renders their ability to be a police officer again that
8  they can be medically retired.
9      Q.  And that's a lifetime retirement; correct?
10      A.  Yes.
11      Q.  And you get some form of payment for the rest of
12  your career until you get to retirement age; correct?
13      A.  I believe so.
14      Q.  Are you familiar with an officer named Dustin Boone?
15      A.  Yes.
16      Q.  How do you know Dustin Boone?
17      A.  I know him from the Police Department.
18      Q.  How well do you know him?
19      A.  Not well.
20      Q.  Have you ever worked with him?
21      A.  A very, very short period of time.
22      Q.  When?
23      A.  I believe it was in 2000 -- it's whenever the
24  Narcotics Division was dispersed back into the districts, I
25  was transferred to the Fifth District where he was also

## Page 23

1  assigned.  I was there for a short period of time and he was
2  working in the Fifth District as well.
3      Q.  Were you ever partners?
4      A.  No.
5      Q.  Have you ever socially hung out with Officer Boone?
6      A.  No, I have not.
7      Q.  Are you aware that Officer Boone was indicted and
8  convicted regarding the beating of an officer, Luther Hall?
9      A.  Yes.
10      Q.  And are you aware that during that trial some of
11  Officer Boone's text messages were released?
12      A.  Just what I've seen in the news, sir.  I don't have
13  any personal knowledge of it.
14      Q.  Okay.  Are you aware that some of the text messages
15  that were released were text messages between Officer Boone
16  and your partner, Officer Zajac?
17      A.  I'm not aware of that.
18      Q.  Nobody has told you in the last five months that
19  there were text messages that were publicly released in the
20  newspapers between Officer Boone and Officer Zajac?
21      A.  Again, I don't remember, sir.  Just what I -- just
22  what I've seen in the news.  It's a situation that I did not
23  want to ask any questions about to anyone because I didn't
24  want to even know about it.
25      Q.  Are you aware that in these text messages Officer

## Page 24

1  Zajac is buying illegal drugs from Officer Boone?
2      A.  No.
3      Q.  Are you aware of your partner, Officer Zajac, ever
4  using illegal drugs?
5      A.  No.
6      Q.  You've never seen him with pills?
7      A.  No.
8      Q.  You've never seen him with any type of illegal
9  substances?
10      A.  No.
11      Q.  Have you ever used any illegal substances?
12      A.  No.
13      Q.  Never used any drugs?
14      A.  Never.
15      Q.  Never used marijuana?
16      A.  I have never smoked marijuana in my life.
17      Q.  Ever used any steroids?
18      A.  No.
19      Q.  Ever used any kind of ADHD type medicine?
20      A.  No.
21      Q.  And Officer Zajac was your partner on Special Ops;
22  correct?
23      A.  Yes, he was.
24      Q.  Did you ever work with -- no.  Let me take that
25  back.

6 (Pages 21 to 24)

## WILLIAM OLSTEN  9/3/2021

### Page 25

1       Did you ever work with an Officer Ronald Vaughan?

2   A. Yes.

3     Q. When did you work with Officer Ronald Vaughan?

4   A. He was also assigned to the Special Operations

5 Division.

6     Q. How long -- let's take a jump. How long were you on

7 Special Ops?

8   A. Several years.

9     Q. Okay. Do you remember exactly when? Or roughly.

10 How about roughly? Do you remember roughly --

11   A. Roughly I would say four years maybe but, I mean,

12 they changed the name of it a couple times so I'm not -- you

13 know, it was Narcotics, it was Special Operations but it was

14 all basically the same thing.

15     Q. Let's take a step back. You mentioned a while ago

16 that Officer Boone got moved off of Narcotics when it was

17 dissolved. Were you on Narcotics when the Narcotics Team got

18 dissolved?

19   A. I'm sorry. What was the first part of the question?

20     Q. I think you testified earlier that when you worked

21 with Officer Boone it's when he was absorbed back into the

22 Fifth District; correct?

23   A. It's whenever --

24   Q. Okay.

25   A. -- I was absorbed in the Fifth District, yes. I was

### Page 26

1 assigned to Narcotics and that unit was dissolved -- absorbed

2 into the area districts.

3     Q. So how long were you with Narcotics?

4   A. Again, it was -- it was basically the same thing as

5 Special Operations. We never left the same -- we were in the

6 same building, same desks, everything. So it's hard to say --

7   Q. Okay.

8   A. -- exactly when that transition was, just the

9 renaming. But maybe a year or so.

10     Q. I think just to make this easier, because I don't

11 really like during depositions when we belabor a lot of

12 points, I'm going to see if I can share this screen. Am I

13 able to share it? Good.

14     I am going to put up on the screen what has been

15 identified to me as City's exhibits in Aldridge v. City, 00005

16 through 0008 and this is your profile. Okay?

17   A. Okay.

18     Q. And let's just go through this.

19     You see here October 2007, that's when you were a

20 new hire; correct?

21   A. Yes.

22     Q. And then you would have been on -- some form of

23 probationary officer for about a year; right?

24   A. Right.

25     Q. And then you were in the Third District for a while;

### Page 27

1 correct?

2   A. Correct.

3     Q. What did you do in the Third District?

4   A. Just a patrol officer.

5     Q. And at that time can you just give me the rough

6 borders of the area that was the Third District?

7   A. It used to be 44 was the northern boundary I

8 believe; the river, Mississippi, was the eastern boundary;

9 Chippewa was the southern boundary; and I believe Kingshighway

10 was the western boundary.

11     Q. Okay. So kind of the south city area like directly

12 around where St. Louis University Hospital is, that type of

13 area; right?

14   A. South, south of 44.

15   Q. Okay.

16   A. So it wouldn't be the hospital in there.

17     Q. All right. I meant the new hospital. There's that

18 new fancy hospital there. Okay.

19     So Third District you were basically just a patrol

20 officer; correct?

21   A. Basically, yes.

22     Q. August 20th, 2012 you were transferred to something

23 called the Rapid Deployment Unit. What is that? I haven't

24 seen that before.

25   A. The Rapid Deployment Unit was a unit that was

### Page 28

1 citywide and their mandate was to go into high crime

2 neighborhoods, similar to the hot spot policing. If there's a

3 lot of crime in one area, we would go to that area.

4     Q. How was that different than the Special Operations

5 Team?

6   A. The Rapid Deployment Unit was uniformed and we drove

7 uniform police vehicles.

8     Q. And it looks like you were on that team for seven

9 months. Does that look right?

10   A. Yes.

11     Q. How were you selected for the Rapid Deployment Team?

12   A. You have to apply for it and interview.

13     Q. All right. And then you left the Rapid Deployment

14 Team in March of 2013; correct?

15   A. Yes.

16     Q. What was the impetus for you leaving the team?

17   A. Whenever the new chief took over I believe he

18 dissolved the Rapid Deployment Unit back into the districts.

19     Q. Okay. Good. Then you went back to the Third

20 District. What did you do on the Third District? You were

21 there for about three months.

22   A. Just patrolled.

23     Q. All right. And after you left the Third District

24 how did you get on Special Ops?

25   A. Applied and interviewed.

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
www.alaris.us      Fax: 314.644.1334

**WILLIAM OLSTEN  9/3/2021**

## Page 29

1  Q.  So basically is it fair to say that from June of
2  2013 until you were moved to admin duty – I'm sorry, until
3  you were moved to the Fifth District in April of 2018 that you
4  were on either Special Ops or Narcotics the whole time?
5  A.  Yes.
6  Q.  So you were there from 2013 from, it looks like
7  here, June 24th, 2013 until you were transferred to the Fifth
8  District on April 15th, 2018; correct?
9  A.  Correct.
10  Q.  What does return from limited duty mean?
11  A.  It means if you're like out injured, once you get a
12  clearing from a doctor to come back to work and they return
13  you from limited duty.
14  Q.  Okay.  So you were put on limited duty in 2016.
15  What was that about?
16  A.  I believe that was a car accident.
17  Q.  Was it a chase or was it just a car accident?
18  A.  It was a – we got T-boned by a guy who was fleeing
19  from our detectives.
20  Q.  In September, early September, before this incident,
21  2017 you were also on limited duty.  What was that for?
22  A.  I honestly don't recall right now what that was
23  from.
24  Q.  Okay.  But you would agree with me that you came
25  back from limited duty on September 12th, 2017; right?

## Page 30

1  A.  Yes.
2  Q.  And that's about two weeks before the incident
3  occurred; correct?
4  A.  Yes.
5  Q.  Okay.  We'll get to why you were moved to admin duty
6  later.  Okay.
7  So you were on Special Ops or Narcotics for upwards
8  of four years; right?
9  A.  I'm sorry?
10  Q.  You were on Special Ops or Narcotics for upwards of
11  four years.
12  A.  Yes.
13  Q.  Actually, it was close to five years, it was more
14  than five years.
15  A.  Close to five years, yes.
16  Q.  During that time did you ever work with Ronald
17  Vaughan?
18  A.  Yes.
19  Q.  Tell me about your work relationship with
20  Mr. Vaughan.
21  A.  We were both assigned to the same unit.  We were
22  mandated with the same duty.  He was on our squad for most of
23  that time.
24  Q.  Did you ever – were you ever assigned to be his
25  partner?

## Page 31

1  A.  No.
2  Q.  But it's fair to say when you're in Special Ops you
3  often do operations with more than just your partner; right?
4  A.  That's fair.
5  Q.  And you would have -- did you do larger operations
6  with Officer Vaughan?
7  A.  Yes.
8  Q.  Do you know what Officer Vaughan – well, sorry.
9  Strike that.
10  Did you ever socialize with Officer Vaughan?
11  A.  Yes.
12  Q.  Tell me about that.
13  A.  You mean outside of work?
14  Q.  Yes.
15  A.  I believe I've gone to a Christmas party or two that
16  he hosted over the years.  Apart from that, we didn't
17  socialize much outside of work.
18  Q.  When was the last time you spoke to Officer Vaughan?
19  A.  After he was indicted.
20  Q.  Actually, let's jump – I forgot something.  Let's
21  jump back to Officer Zajac.  Okay?
22  A.  Okay.
23  Q.  I just told you about text messages that were
24  released publicly between Officer Boone and your former
25  partner where your former partner is obtaining illegal

## Page 32

1  narcotics.  Okay?  What is your reaction to that information?
2  A.  I don't believe he's ever obtained illegal narcotics
3  from anyone.
4  Q.  Well, I'm telling you right now that there are text
5  messages that are publicly out there from Officer Zajac
6  stating: I want these narcotics.  I've taken these narcotics.
7  I like how these narcotics affect me.  I would like to obtain
8  more narcotics.
9  Assuming everything I just said is true, what is
10  your reaction to that?
11  A.  I don't have a comment on that, sir.
12  Q.  But I'm asking:  What is your reaction to that?  How
13  do you feel about that?  What is your reaction to that?
14  A.  I don't have a comment on that, sir.
15  Q.  Do you not have a comment because you don't have a
16  reaction or you just don't want to answer my question?
17  A.  I don't have a reaction to it.
18  Q.  You have no reaction to the fact that your former
19  partner is publicly identified, as a sworn law enforcement
20  officer, as to buying illegal drugs?  You have no reaction to
21  that?
22  A.  I don't know if it's true or not, sir, so I don't
23  know.
24  Q.  Let's just play a game here and let's assume that
25  what's publicly reported and was entered into evidence in a

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## WILLIAM OLSTEN  9/3/2021

### Page 33

1  Federal suit is true.  Let's assume that's true.  What would
2  your reaction be if that were true?
3      MR. MILLIKAN:  I'm going to just object to the
4  extent it calls for speculation.
5      But Bill, assuming those -- that information is
6  true, what's your reaction?  Go ahead and answer.
7      A.  I would not approve of it.
8      Q.  (By Mr. Khazaeli)  Okay.  And based on your
9  experience as a police officer if an officer was found buying
10 and using illegal narcotics what should happen?
11     A.  Buying and using illegal narcotics?
12     Q.  Yes.
13     A.  Is that what you said?
14     Q.  Yeah.  What should happen to the officer?
15     A.  They should not be a police officer anymore.
16     Q.  Right.  Should they be able to get a lifetime
17 retirement?
18     A.  I'm not sure.
19     Q.  Okay.  Let's go to Ronald Vaughan.  You said that
20 the last time you spoke to him was -- you said something about
21 his indictment.  Was it before or after his indictment?
22     A.  You said the last time I spoke with him and I think
23 -- I believe the last time I spoke with him was after his
24 indictment.
25     Q.  Tell me about what you know about his indictment.

### Page 34

1      A.  Very little.  Just what I've read.  That apparently
2  he had something to do with a medical form or something that
3  he turned in that was not properly signed or filled out or
4  something.  I'm not sure exactly.
5      Q.  Well, I can tell you that what has publicly been
6  reported and that what is listed in the criminal Complaint
7  against him is that the St. Louis Police Department determined
8  that he forged a doctor's note from a doctor stating that he
9  needed to go out on paid COVID leave.  Have you heard that?
10     A.  That sounds right.
11     Q.  Okay.  When you spoke to Mr. Vaughan did you discuss
12 his indictment?
13     A.  I didn't ask him about that.
14     Q.  Did he bring it up?
15     A.  No.
16     Q.  Have you spoken to anybody about Ronald Vaughn's
17 indictment for forgery?
18     A.  No.
19     Q.  You worked with Ronald Vaughan for a long time;
20 correct?
21     A.  Yes.
22     Q.  What was your reaction to learning that he was
23 indicted for forgery?
24     A.  I was surprised.
25     Q.  Why were you surprised?

### Page 35

1      A.  I just -- it just seemed silly to forge to a
2  doctor's note.
3      Q.  I mean, this is a doctor's note to get two weeks of
4  paid leave.  Other than it was silly, do you have any other
5  reaction to that?
6      A.  No.
7      Q.  Are you aware that Officer Vaughan had previously
8  been accused of planting drugs on a witness that he arrest --
9  on a suspect that he arrested?
10     A.  I don't recall.
11     Q.  When you worked with him on the Narcotics Team,
12 nobody ever informed you that Ronald Vaughan had been accused
13 of planting drugs on somebody?
14     A.  No.
15     Q.  You'll concede that one of the things that you did
16 on the Special Ops and Narcotics Team was arrest people for
17 having drugs on them; correct?
18     A.  Yes.
19     Q.  Sitting here today would you want a -- would you
20 have wanted to know that somebody on your team had been
21 accused of planting drugs on somebody in the past?  Is that
22 information you think you should have known?
23     A.  Possibly.  I mean, if they were actually doing it
24 then yes, I'd want to know.
25     Q.  But wouldn't you want to know about any accusations

### Page 36

1  against anybody on your team?
2      A.  Not necessarily.
3      Q.  What if you were to learn that a Judge had thrown
4  out a case involving Officer Vaughan after watching a video
5  that allegedly showed that he planted drugs on somebody?  Is
6  that something you would want to know about another officer
7  that you're in the field with?
8      A.  I suppose.
9      Q.  When you say I suppose, what does that mean?
10     A.  Again, I mean, if he was actually doing something
11 like that, then yes, I'd want to know.
12     Q.  And sitting here today you cannot remember ever
13 being told that something like that occurred with Officer
14 Vaughan; correct?
15     A.  No.
16     Q.  Now, Officer Vaughan was involved in a shooting that
17 received a lot of publicity in St. Louis.  Do you know about
18 that shooting?
19     A.  I believe so, yes.
20     Q.  It was involving a man named Mansur, M-a-n-s-u-r,
21 last name Ball-Bey, B-a-l-l dash B-e-y.  Are you familiar with
22 the Mansur Ball-Bey shooting?
23     A.  Yes.
24     Q.  Were you there?
25     A.  Yes, I was.

9 (Pages 33 to 36)

## Page 37

1  Q.  Tell me about that.

2  A.  Basically we were executing a search warrant on a

3  residence and Detective Ronald Vaughan and his partner

4  Detective Kyle Chandler were involved in a shooting with

5  Mansur Ball-Bey in the rear of that house.

6  Q.  Did you see the shooting?

7  A.  No, sir.  I was in the front of the house.

8  Q.  Did you see Mr. Ball-Bey with a weapon?

9  A.  No, I did not.

10  Q.  And you would agree with me that there were lots

11  of — there was lots of publicity around the shooting;

12  correct?

13  A.  Yes.

14  Q.  That there were a lot of protests regarding the

15  shooting; correct?

16  A.  Yes.

17  Q.  That there were a lot of accusations made against

18  Mr. Vaughan and Mr. Chandler that they had murdered

19  Mr. Ball-Bey; correct?

20  A.  I — I don't recall but that sounds possible.

21  Q.  That there was a lot of — specific protests were

22  about the two officers who shot Mr. Ball-Bey; correct?

23  A.  I — yeah, I believe there was protests there.

24  Q.  After the Mansur Ball-Bey shooting did anybody from

25  Internal Affairs at the Police Department come and speak to

## Page 38

1  you?

2  A.  I don't believe so.

3  Q.  After the Mansur Ball-Bey shooting did anybody

4  investigating any of the officers come and speak to you?

5  A.  I don't believe so.

6  Q.  Were you interviewed by the Force Investigation Unit

7  after the shooting?

8  A.  It's possible.  I may have been interviewed by them.

9  Q.  But you don't remember sitting here.

10  A.  Yeah, I don't remember specifically but it sounds

11  like something that would happen.

12  Q.  You don't remember ever, though, Internal Affairs

13  investigating; correct?

14  A.  I don't remember, no, sir.

15  Q.  All right.  You said he was with his partner Kyle

16  Chandler; correct?

17  A.  Correct.

18  Q.  Do you know what Officer Chandler is doing right

19  now?

20  A.  No, I don't.

21  Q.  Okay.  When was the last time you spoke to Officer

22  Chandler?

23  A.  It's been a long time.  I don't recall.

24  Q.  But he was a — one of the other two people who was

25  involved in this shooting; right?

## Page 39

1  A.  Correct.

2  Q.  And let's be clear about this:  This was an

3  accusation that the St. Louis Police Department killed a black

4  man; correct?

5  A.  Yes.

6  Q.  Have you heard anything about Officer Chandler being

7  taken off of street duty?

8  A.  Yes.

9  Q.  What have you heard about Officer Chandler being

10  taken off of street duty?

11  A.  I heard that he was put into Communications Division

12  and I just heard that he was — I don't know if he was

13  terminated or resigned.  Recently —

14  Q.  And —

15  A.  — I've heard that he's no longer working there.

16  Q.  And was this based on the fact that he might have

17  overdosed on a lot of drugs?

18  A.  Yes.

19  Q.  So Kyle Chandler, the other guy on the Mansur

20  Ball-Bey shooting, you've heard overdosed on illegal drugs and

21  was suspended; correct?

22  MR. MILLIKAN:  I'm just going to object to the

23  extent that it lacks foundation.

24  If you know, Bill, you can answer.

25  A.  It —

## Page 40

1  Q.  (By Mr. Khazaeli)  Let me withdraw that.  Let me

2  withdraw that.

3  Mr. Olsten, you just testified that you've heard

4  that information; right?

5  A.  Yes.

6  Q.  Who did you hear it from?

7  A.  I don't remember.  It's been a while.

8  Q.  Well, I mean, this happened within the last year.

9  You don't remember who you spoke to about one of your law

10  enforcement colleagues overdosing on drugs?  You don't

11  remember that conversation?

12  A.  I don't remember who I spoke to about it, no, sir.

13  Q.  Do you remember the context of when you spoke to

14  somebody about this?

15  A.  No, sir.

16  Q.  Do you remember if it was over text message or

17  email?

18  A.  No.

19  Q.  Was it through Facebook Messaging?

20  A.  No.

21  Q.  Are you aware that as a Defendant in these lawsuits

22  you have an obligation to preserve any documents relating to

23  people involved in the incident at issue in this case;

24  correct?

25  A.  That is — I'm sorry.  Can you repeat that?

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
www.alaris.us
Fax: 314.644.1334

## Page 41

1    Q. If you have any evidence relating to what happened
2  on the night of the Busch Stadium protest or related to any of
3  the other people involved, you realize that you can't destroy
4  that evidence; correct?
5    A. Yes. I suppose.
6    Q. So one of the things I'm just going to ask you to do
7  is at the end of this deposition look back with your lawyer
8  and go through all of your documents and tell me if you have
9  any documents relating to any of these questions I'm asking
10 about the other officers there: Officer Vaughan, Officer
11 Chandler, and we're going to get to some other ones. Okay?
12   A. Okay.
13   Q. So if you just look back with Brian about that
14 because we need to have those produced.
15     But you can – with that back there, just to wrap
16 this up, you – your testimony is that you had been informed
17 that Officer Chandler is being either terminated or
18 disciplined because he was found with drugs and over-D'd on
19 illegal drugs; correct?
20   A. I'm not sure if they were illegal drugs but yes to
21 everything else.
22   Q. Okay. Oh, one other thing we didn't speak about,
23 Mr. Olsten, and as you can tell I try to go very quickly
24 through stuff, if at any point you need a break just let us
25 know. I'm probably hoping to take a break a little bit after

## Page 42

1  10:00 o'clock in about 15 minutes. But if you need one
2  earlier than that let me know. Okay?
3    A. Yes, sir.
4    Q. Are you aware of any other malfeasance that either
5  Officer Vaughan or Officer Chandler has ever been accused of?
6    MR. MILLIKAN: I'm going to object to the form of
7  the question. It's vague. I'm not sure what malfeasance
8  means.
9      But if you understand the question, Bill, you can
10 answer.
11   A. I don't – yeah, I don't recall any others.
12   Q. (By Mr. Khazaeli) You don't recall them being
13 accused of any criminal activity?
14   A. No.
15   Q. Do you ever recall of them being accused of any
16 inappropriate activity?
17   A. No.
18   Q. Okay.
19   MS. DUNCAN: Javad, are you done with this personal
20 profile?  Can you take that –
21   MR. KHAZAELI: Oh. Thank you. Yeah. Sorry.
22   MS. DUNCAN: Thank you.
23   MR. KHAZAELI: Sorry about that. Yeah, you gotta
24 look at our pretty faces. It's much better this way.
25     I'd like everybody to note that Abby rolled her eyes

## Page 43

1  when I said that.
2    Q. (By Mr. Khazaeli) All right. Let's go to Larry
3  Wentzel. Are you aware Larry Wentzel is on the Circuit
4  Attorney's exclusionary list?
5    A. I'm not aware of that.
6    Q. But you've been on the exclusionary list before;
7  correct?
8    A. Yes.
9    Q. Why?
10   A. That's a great question, sir. We've never been
11 informed of why I was on there.
12   Q. When did you find out that you were on the
13 exclusionary list? Before or after you were investigated for
14 the case at the bar?
15   A. At where?
16   Q. At the bar. Yeah.
17   A. I don't remember when I was told.
18   Q. Okay. What happened when you were told – tell me
19 the circumstances of how you were aware you were on the
20 exclusionary list?
21   A. I believe it – I don't know if it was just an email
22 that was sent out to the Department or if we were contacted
23 directly, but someone within the Police Department advised
24 that I was on the list.
25   Q. And what did you do once you found out you were on

## Page 44

1  the list?
2    A. I didn't do anything.
3    Q. You didn't call your union?
4    A. I don't remember if I did or not.
5    Q. Did you speak to – now, I'm not asking, if you
6  spoke to your attorney, I do not want you to tell me if you
7  did speak to your attorney what your attorney told you.
8      But did you speak to your attorney after that?
9    A. It's possible. I honestly don't remember if I
10 called him or not.
11   Q. Do you remember taking any steps to figure out why
12 you were on the exclusionary list?
13   A. I may have made some phone calls or tried to reach
14 out to the Circuit Attorney's Office, I don't remember
15 exactly.
16   Q. Did you take any steps to try to remove yourself
17 from the exclusionary list?
18   A. I don't recall.
19   Q. Based on your knowledge what is the exclusionary
20 list?
21   A. A list of officers that are not allowed to go into
22 the Circuit Attorney's Office.
23   Q. When you say not allowed to go into the Circuit
24 Attorney's Office specifically what do you mean?
25   A. That officers physically can't go into the Circuit

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
www.alaris.us                              Fax: 314.644.1334

## Page 45

1 Attorney's Office to like apply on cases or testify or things
2 of that nature.
3     Q. And is this because the Circuit Attorney's Office
4 has stated that they believe that there's some issues with the
5 officers; correct?
6     A. I don't know. I guess – I guess, yeah, they don't
7 like the officer, they think something's wrong with him or
8 what, I'm not sure.
9     Q. But you never – you never found out what that was
10 regarding you?
11     A. No.
12     Q. But you can confirm sitting here today that you were
13 told that you were on the exclusionary list at some point;
14 correct?
15     A. Yes.
16     Q. Did that affect your day-to-day job other than going
17 into the Circuit Attorney's Office to apply for charges?
18     A. That would be the only thing that would change.
19     Q. Did Sergeant Bartlett come and tell you that there
20 was some issue?
21     A. No.
22     Q. Did he change your day-to-day activities?
23     A. No.
24     Q. Did he allow you to do every single thing the exact
25 same way as before?

## Page 46

1     A. Yes.
2     Q. Did IAD ever come and investigate and speak to you
3 about your time on the exclusionary list?
4     A. No.
5     Q. Did any police officer ever come and investigate and
6 talk to you about you being on the exclusionary list?
7     A. No.
8     Q. Okay. Sitting here today you have no knowledge
9 about Larry Wentzel being on the exclusionary list; correct?
10     A. No, I don't.
11     Q. When you worked with him and you were out in the
12 field with him were you ever informed by any supervisors that
13 he was on the exclusionary list?
14     A. No.
15     Q. So if you had gone in to do a bust with Larry
16 Wentzel you would have had no idea that there were issues with
17 him presenting evidence to the Circuit Attorney's Office?
18     A. No.
19     Q. Did other people on your team know that you were on
20 the exclusionary list?
21     A. I'm not sure if they did or not.
22     Q. So there's a chance that you could have gone in to
23 do a bust and other people on your team would not have known
24 that there was an issue; correct?
25     A. It's possible.

## Page 47

1     Q. Okay. Joseph Schmitt, how do you know Joseph
2 Schmitt?
3     A. He's a co-worker or was a co-worker at the Police
4 Department.
5     Q. What unit did he work for?
6     A. I believe he was just in the Third District.
7     Q. How well did you know him?
8     A. I'm sorry?
9     Q. How well did you know him?
10     A. We socialized occasionally outside of work.
11     MR. KHAZAELI: All right, guys, I think this is
12 probably a good time to take a five-minute break.
13     THE VIDEOGRAPHER: We're going off record at
14 9:56 a.m.
15     (Whereupon, there was a break in the proceedings
16 from 9:56 a.m. to 10:07 a.m.)
17     THE VIDEOGRAPHER: Back on the record 10:07 a.m.
18     Q. (By Mr. Khazaeli) Okay. Mr. Olsten, I just want to
19 go over just a few – to summarize a few things.
20     So we just spoke about criminal charges against
21 Officer Vaughan; correct?
22     A. Yes.
23     Q. And we spoke about an overdose and a move to
24 terminate Officer Chandler; correct?
25     A. Yes.

## Page 48

1     Q. And we spoke about Officer Wentzel being on the
2 exclusionary list; correct?
3     A. Yes.
4     Q. And we spoke about Officer Zajac being alleged to
5 have used drugs; correct?
6     A. Yes.
7     Q. And we spoke about you being on the exclusionary
8 list; correct?
9     A. Yes.
10     Q. And we'll talk about it more but at separate times
11 you were criminally charged involving two separate incidents;
12 correct?
13     A. Yes.
14     Q. Do you recall internal Affairs ever – I'm sorry.
15 Take a step back.
16     And all of the people we just spoke about were
17 people who were on the Special Operations Team in 2017;
18 correct?
19     A. Yes.
20     Q. And in addition to those things I spoke to you
21 about, Officers Chandler and Vaughan were involved in the
22 shooting of Mr. Ball-Bey; correct?
23     A. Correct.
24     Q. At any point while you were on the Special
25 Operations or Narcotics Team did anybody from Internal Affairs

12 (Pages 45 to 48)

## WILLIAM OLSTEN  9/3/2021

### Page 49

1 come and speak to you about the culture of the team?
2      A. No.
3      Q. Did anybody come and talk to you about the
4 activities of the team?
5      A. No.
6      Q. Did anybody come and talk to you about any
7 malfeasance that the team was involved in?
8      A. No.
9      Q. Did anybody from the criminal unit of the Police
10 Department come and talk to you about any investigations into
11 the Special Operations Team?
12      A. No.
13      Q. Did anybody from the criminal side of the Police
14 Department ever come and talk to you about any malfeasance
15 alleged regarding the Special Operations Team?
16      A. No.
17      Q. Did anybody from IAD ever come and talk to you about
18 not the team as a whole but about any malfeasance perpetrated
19 by any member of the Special Operations Team?
20      A. No.
21      Q. Did anybody from the criminal unit of the St. Louis
22 Police Department ever come and talk to you about any
23 potential malfeasance by any member of the Special Operations
24 Team?
25      A. No.

### Page 50

1      Q. I know that you worked this protest at -- for the
2 Jason Stockley case. Did you work any other protests?
3      A. I believe so, yes.
4      Q. Were you working at City Hall the day of the verdict
5 coming down?
6      A. I don't believe I was. I don't remember, though.
7      Q. Were you working two nights later, that's the night
8 that Officer Hall was beaten at what we like to call the
9 kettling, the mass arrest, at Washington and Tucker? Were you
10 working either of those nights?
11      A. I was working that night, yes.
12      Q. Where were you working on that night?
13      A. So that night we were in our cars assigned as like
14 outer perimeter for the city, just basically --
15      Q. When you say we, who is we?
16      A. Special Operations.
17      Q. Okay. Keep going.
18      A. We weren't down there for the kettling but we were
19 kind of on the outskirts of the city just on stand-by to
20 respond if we needed to.
21      Q. Okay. What kind of car were you driving?
22      A. An unmarked police car.
23      Q. What color was it?
24      A. I don't remember exactly which car I had that night,
25 but we typically drove a dark gray Mazda. I'm not sure if

### Page 51

1 that's what I had that night but it's typically what we drove.
2      Q. Okay. So tell me about what was going on that day.
3 What were you doing that day?
4      A. Again, we were just on the outskirts of the city
5 just on stand-by.
6      Q. Okay. Do you remember any incidents that day?
7      A. No.
8      Q. Just me one second.
9      MR. KHAZAELI: Can we go off record for a minute?
10      THE VIDEOGRAPHER: Going off record at 10:12 a.m.
11      (Whereupon, there was a break in the proceedings
12 from 10:12 a.m. to 10:13 a.m.)
13      THE VIDEOGRAPHER: Back on the record, 10:13 a.m.
14      Q. (By Mr. Khazaeli) Do you know an Officer Jarred
15 Thacker?
16      A. Yes.
17      Q. How do you know Officer Thacker?
18      A. We worked together in the Special Operations
19 Division.
20      Q. Okay. How long did you work with Officer Thacker?
21      A. I don't remember how long he was down there, if he
22 was there the whole time or just -- I'm not sure but probably
23 a couple years at least.
24      Q. About how many people were on the Special Operations
25 Team at that time?

### Page 52

1      A. Oh, there was -- our specific team had maybe eight
2 people but Special Operations as a whole probably had 20 to 30
3 I would guess.
4      Q. Let's go through the eight people. I'm going to ask
5 for each of these officers tell me if they were on your team
6 or if they were on general Special Operations. Okay?
7      A. Yes.
8      Q. Ronald Vaughan.
9      A. My team.
10      Q. Kyle Chandler.
11      A. My team.
12      Q. Officer Zajac.
13      A. My team.
14      Q. Officer Wentzel.
15      A. My team.
16      Q. Officer Thacker.
17      A. My team.
18      Q. Who else was on your team other than those people?
19      A. James Bain, Marcus Alston, Matt Manley. And I'm
20 trying to think of who else.
21      Q. While you're thinking, Alston is spelled
22 A-l-s-t-o-n?
23      A. Yes, sir. That's all I can remember really.
24      Q. Are you aware of public reports about Officer
25 Thacker being suspended because of an allegation that he

**WILLIAM OLSTEN  9/3/2021**

## Page 53

1  sexually assaulted a woman?
2     A.  I didn't hear that about Thacker.
3     Q.  But you've heard that about other officers; haven't
4  you?
5     A.  I heard that about another officer, yes.
6     Q.  What officer?
7     A.  Leshaw, I think.  Leshaw I believe is his last name.
8     Q.  L-e-s-h-a-w.
9     A.  I'm not sure how you spell it.
10    Q.  I was just telling the Court Reporter that's how you
11 spell it.
12    A.  I'm sorry.
13    Q.  I think.  I could be wrong.  Okay.
14       So let's go back to the night of the Luther Hall
15 protest.  What did you see?
16    A.  I didn't see anything.  I was in my car on the
17 outskirts of the city.
18    Q.  Was your car ever within the protesters, near the
19 protesters?
20    A.  I don't believe so.
21    Q.  Do you have any recollection of your car being near
22 protesters?
23    A.  No.
24    Q.  Has anybody informed you that there's a video of an
25 unmarked police car driving through a crowd of people at high

## Page 54

1  speed going backwards?  Do you know this video?
2     A.  From that protest?
3     Q.  From that protest.
4     A.  No, I don't.
5     Q.  You've never seen that video?
6     A.  No.
7     Q.  Nobody from IAD has ever come and spoke to you about
8  that video?
9     A.  No.
10    Q.  Nobody from the Police Department has ever come and
11 spoke to you about that video?
12    A.  No.
13    Q.  And the reason this video's important is there are a
14 lot of people who allege that this officer driving through the
15 crowd and almost hitting people is what precipitated a lot of
16 the property damage that night.  Do you know anything about
17 that?
18    A.  No, sir.
19    Q.  Are you aware that -- well, how long did you work
20 for Thacker?
21    A.  Work with Thacker?
22    Q.  Yeah.
23    A.  Probably a couple years.
24    Q.  And when you worked with Officer Thacker how often
25 would you guys see each other?

## Page 55

1     A.  Daily.
2     Q.  It's fair to say that you knew each other well?
3     A.  As much as you can know a work colleague I guess.
4     Q.  In a professional context; correct?
5     A.  Yes.
6     Q.  You saw each other all the time?
7     A.  At work, yes.
8     Q.  Yeah.  You saw each other in your vehicles all the
9  time; correct?
10    A.  I suppose.
11    Q.  Are you aware that Officer Thacker has identified
12 you as the driver of the vehicle that drove through the crowd?
13    A.  No.
14    Q.  Did you drive a vehicle through a crowd of people at
15 the -- during the protest on September 17th?
16    A.  Not that I recall, no.
17    Q.  Did you drive a vehicle at high speed backwards
18 through a group of people?
19    A.  Not that I recall.
20    Q.  And this is a video that was tweeted out by the St.
21 Louis Police Department.  Nobody ever asked you any questions
22 about that?
23    A.  No.
24    Q.  You would agree with me that there aren't many
25 unmarked Special Operations cars; right?

## Page 56

1     A.  There's quite a few.
2     Q.  How many would you say?
3     A.  They change them out pretty frequently.  But, I
4  mean, there's got to be 20 or 30 probably.
5     Q.  But you also will agree with me that there are only
6  about 20 people who are on Special Ops at that point; right?
7     A.  20 to 30, yeah.
8     Q.  So if the Police Department was trying to figure out
9  who drove that car they could have spoken to 20 to 30 people;
10 correct?
11    A.  Yes.
12    Q.  Did anybody ever come and ask you about whether or
13 not you were driving that car?
14    A.  No.
15    Q.  Let's go to the incident where you were criminally
16 charged and I believe the case was dismissed involving a
17 shooting at Bomber O'Brien's.  And that's
18 O-apostrophe-B-r-i-e-n I believe.  Let me look that up.
19       Tell me what happened that night.
20       MR. MILLIKAN:  I just want to object.  Or well, I'm
21 going to actually instruct you, Bill, to or I'm going to
22 recommend that you do is assert your Fifth Amendment
23 privilege in that matter.
24       MR. KHAZAELI:  Isn't that case dismissed?  Was it
25 dismissed with --

14 (Pages 53 to 56)

WILLIAM OLSTEN  9/3/2021

## Page 57

1     MR. MILLIKAN: It was dismissed --
2     MR. KHAZAELI: Let's go off, let's go off the record
3  for a second.
4     MR. MILLIKAN: Sure.
5     THE VIDEOGRAPHER: Going off record 10:20 a.m.
6     (Whereupon, there was a break in the proceedings
7  from 10:20 a.m. to 10:20 a.m.)
8     THE VIDEOGRAPHER: Back on the record, 10:20 a.m.
9     Q. (By Mr. Khazaeli) Mr. Olsten, before we went on a
10  quick break your attorney advised you to not answer questions
11  regarding this incident and to assert your First Amendment
12  right -- I'm sorry, your Fifth Amendment rights. Can you tell
13  me what you're going to do?
14     A. I'll be listening to my attorney and asserting my
15  Fifth Amendment right.
16     Q. Okay. We'll move on.
17     MR. KHAZAELI: Now, Brian, I'm going to ask some
18  periphery questions about this. Okay? And I think these
19  should be fine but let me know if you've got problems
20  with them. Okay?
21     MR. MILLIKAN: Okay.
22     Q. (By Mr. Khazaeli) Without telling me what was
23  discussed were you ever -- did Internal Affairs ever come and
24  speak to you regarding the Bomber O'Brien incident?
25     A. I don't believe -- I don't know if it was Internal

## Page 58

1  Affairs or the Force Investigative Unit but I spoke to someone
2  down there.
3     Q. Do you know who you spoke to?
4     A. I don't remember.
5     Q. And in -- time-wise how soon after the shooting did
6  you speak to somebody?
7     A. I think it was relatively quick. I don't remember
8  exactly but it was probably within a week or two I would
9  think.
10     Q. And that's just the general investigation whenever
11  there's a shooting; correct?
12     A. Yes.
13     Q. Let's put that aside. Other than that did anybody
14  from Internal Affairs ever come and speak to you about what
15  occurred during that event?
16     A. I don't, I don't believe so.
17     Q. Did anybody from the Police Department come and
18  speak to you about what occurred at that event?
19     A. Like I said, I think it was Force Investigative Unit
20  that I spoke with.
21     Q. Other than that time just a week or two after the
22  event did anybody else come and interview you about the event?
23     A. I don't think so.
24     Q. All right. We can move on.
25     Let's go to the night of the Busch Stadium incident.

## Page 59

1  All right? What do you recall about how you ended up down at
2  the protest?
3     A. I believe we were just assigned to be down there
4  that evening.
5     Q. Do you remember by who?
6     A. I'm not sure who would have, who would have told us
7  to be down there.
8     Q. Had you received any specific training about how to
9  deal with large protests of this caliber previous to being
10  assigned down there?
11     A. I don't recall.
12     Q. Were you ever assigned to the Civil Disobedience
13  Team?
14     A. No, I was not.
15     Q. Did you ever go through a civil disobedience
16  training?
17     A. I was never assigned to it and I don't believe I was
18  trained in it either.
19     Q. Back in the Academy we talked about how you had some
20  Constitutional training. Do you recall ever having any
21  training in the Academy about how to deal with large scale
22  protests?
23     A. It's possible but I don't remember exactly in the
24  Academy, it's been so long.
25     Q. Do you remember any point during your ten plus year

## Page 60

1  police career of ever having any training on how to deal with
2  large scale protests?
3     A. I don't recall.
4     Q. Do you recall anybody ever stating any kind of
5  apprehension about having officers, Detectives Vaughan and
6  Chandler, at a protest that is a protest about the shooting of
7  a black man?
8     A. I don't recall that, sir.
9     Q. I mean, we spoke earlier: They were targets of a
10  previous protest; correct?
11     A. Yeah, it's possible. I don't know if they were
12  exactly targets or just the Police Department as a whole.
13     Q. But they were the ones who shot the person who was
14  the person that the protests were about; correct?
15     A. Correct.
16     Q. You don't know of any other officers that shot
17  Mr. Ball-Bey other than Officers Chandler and Vaughan;
18  correct?
19     A. Correct.
20     Q. Did anybody say, hey, it's probably not a good idea
21  to have these guys down here?
22     A. I don't recall if they did or not but, you know, I'm
23  not sure.
24     Q. I mean, you can understand why I'm coming here.
25  These guys are either people who killed a black man improperly

15 (Pages 57 to 60)

## WILLIAM OLSTEN  9/3/2021

### Page 61

1 or they were unfairly targeted for accused of doing such a
2 thing. Right?
3    A. Yes.
4    Q. One of those things; right?
5    MR. MILLIKAN: Hold on. I'm going to object to
6 that. I think it -- it lacks foundation. I mean,
7 there's no evidence in the record that would suggest that
8 their names were even out in the public.
9    MR. KHAZAELI: I mean, the names were released.
10   Q. (By Mr. Khazaeli) But let's just: Assuming their
11 names were out in the public. Well, forget assuming their
12 names were out in the public. They themselves would have
13 known that they were the ones who shot Mr. Ball-Bey; correct?
14   A. Yes.
15   Q. So they would know either if they properly shot
16 Mr. Ball-Bey or improperly shot Mr. Ball-Bey; correct?
17   A. Yes.
18   Q. And if the protests were about a shooting that they
19 thought was proper, it would have been fair to say that they
20 would have thought the criticism was unfair; right?
21   A. Yes.
22   Q. Okay. So did anybody at all in the Special
23 Operations Team say why are these two guys out here?
24   A. Not that I recall.
25   Q. Do you ever recall seeing Officer Vaughan act

### Page 62

1 improperly?
2    A. No.
3    Q. Did you ever see Officer Chandler act improperly?
4 Never, ever?
5    A. No.
6    Q. And who was in charge of you guys that night?
7    A. Our immediate supervisor was Eric Bartlett who is a
8 Sergeant.
9    Q. And Eric Bartlett would have been the person who was
10 in charge of Jarred Thacker; correct?
11   A. Yes.
12   Q. Who was accused of raping a woman. So Officer --
13 I'm sorry, Sergeant Bartlett would have been the person who
14 was in charge of Officer Wentzel; correct?
15   A. Yes.
16   Q. Who is, as you've testified, like -- in the process
17 of possibly being terminated for overdosing on drugs; correct?
18   A. No, not Officer Wentzel.
19   Q. Sorry. Sorry. Sorry. Officer -- let me strike
20 that. Officer Chandler; correct? Let me strike all that.
21   Officer -- Sergeant Bartlett would be in charge of
22 Officer Chandler who is currently in the process of possibly
23 being terminated for overdosing on drugs; correct?
24   A. Sergeant Bartlett would have been in charge of our
25 whole team that night, yes.

### Page 63

1    Q. That includes Officer Zajac; correct?
2    A. Yes.
3    Q. That includes you; correct?
4    A. Yes.
5    Q. That includes Ronald Vaughan; correct?
6    A. Yes.
7    Q. Do you know of any IAD investigations, did anybody
8 ever speak to you about the fact that Sergeant Bartlett is
9 managing this team?
10   A. No.
11   Q. I mean, from what we've talked about so far, we're
12 talking about you, Vaughan, Chandler, Wentzel, Zajac, Thacker.
13 That's six people that were on the team. Right?
14   A. Yes.
15   Q. And you have named three other people; right?
16   A. Yes.
17   Q. Alston, Bain, and Manley; correct?
18   A. Yes.
19   Q. So six of the nine people that Sergeant Bartlett
20 supervised that you can remember have had some allegation of
21 malfeasance, major malfeasance; correct?
22   A. I don't -- I don't believe --
23   Q. If everything -- if everything that I told you today
24 is true; right?
25   A. It -- yes.

### Page 64

1    Q. All right. And you know of no investigations into a
2 Sergeant who six out of the nine people under him had
3 such allegations made? Nobody ever spoke to you about that;
4 correct?
5    A. No.
6    Q. What training have you received in de-escalation?
7    A. What training?
8    Q. Yes.
9    A. Just what we receive in the Academy.
10   Q. Do you recall having any followup training regarding
11 de-escalation after you left the Academy in 2007?
12   A. It's possible.
13   Q. Do you recall any sitting here today?
14   A. I don't remember. We, I mean, we have to do several
15 trainings every year to keep our POST license and it's always
16 different so I'm not sure exactly.
17   Q. Tell me what you -- tell me sitting here today what
18 your -- what your knowledge is about de-escalation.
19   A. My knowledge of it is to verbally try to de-escalate
20 a volatile situation before anything else.
21   Q. Why are you trained to verbally try to de-escalate a
22 volatile situation?
23   A. To avoid a physical confrontation.
24   Q. Talk to me about the levels of deescalation.
25   A. The levels of de-escalation?

16 (Pages 61 to 64)

**WILLIAM OLSTEN  9/3/2021**

## Page 65

1  Q. Yep. Have you ever heard of mere presence as a form
2  of de-escalation?
3  A. Yes.
4  Q. Tell me what that means.
5  A. It means just the presence of being there as a
6  police officer, as an authority figure.
7  Q. All right. Have you heard of verbal uses of
8  de-escalation?
9  A. Yes.
10  Q. Tell me about that.
11  A. It's verbally trying to de-escalate the situation.
12  Q. And what — sorry. I think you already answered
13  this but I didn't write it down: What's the reason that you
14  verbally try to do stuff like that?
15  A. To avoid a physical confrontation.
16  Q. Okay. Is it true to say that if you use
17  antagonistic language that it would possibly increase the
18  chances of a physical confrontation?
19  A. It's possible.
20  Q. Have you reviewed any videos of the incident that is
21  at question in the Busch Stadium event?
22  A. Yes, I have.
23  Q. And when was — when did you review those? And
24  don't — if you did it with your attorney I do not want you to
25  tell me what you spoke about. But when did you review these

## Page 66

1  videos?
2  A. It would have been before the criminal trial with my
3  attorney.
4  Q. Okay. Was that the last time you reviewed them?
5  A. Yes.
6  Q. And you can hear things in the video; correct?
7  A. Yes.
8  Q. And a member of the public was cursing you out
9  during the video; correct?
10  A. Yes.
11  Q. And you said — you gestured to that person and say
12  well, come on, fuck me up then; correct?
13  A. Yes.
14  Q. Is that de-escalation?
15  A. Not necessarily.
16  Q. What scenario would telling a person to come and
17  fuck me up then be de-escalation?
18  A. I'm not sure, sir.
19  Q. Can you think of any scenario where that would be
20  de-escalation?
21  A. Not off the top of my head.
22  Q. And in the video we see two African-American
23  officers kind of push you to the side and move you away from
24  the area; correct?
25  A. No, that's not true. I was actually walking

## Page 67

1  backwards with — my arm was hooked inside of one of the
2  suspect's arms. So I was walking him backwards but kind of
3  being pulled at the same time as they were escorting him.
4  Q. Correct. But in the video we see two other officers
5  walk near you and kind of get in between you and the person
6  who's cursing you; correct?
7  I mean, I can show you the video if you want, but do
8  you recall seeing that?
9  A. I don't recall seeing that, no.
10  Q. But you'll agree with me that eventually you moved
11  the suspect towards an area away from the protesters; correct?
12  A. Yes.
13  Q. We see you leave the video; correct?
14  A. Yes.
15  Q. And it's fair to say at that point — well, what was
16  going through your mind when you told the citizen who was
17  cursing you out to come and fuck me up then? What was going
18  through your mind?
19  A. Honestly I don't remember what was going through my
20  mind.
21  Q. It's fair to say that you weren't calm at that
22  point; correct?
23  A. It was a hectic situation at that time.
24  Q. Right. It was a hectic situation where you say come
25  on and fuck me up then, you leave the area, you get away from

## Page 68

1  the protesters; correct?
2  A. Yes.
3  Q. Then you choose to come back to the protesters;
4  correct?
5  A. No. I just — I stopped. I didn't come back to
6  them. I stopped at a — there was like a makeshift fence
7  there where we handed off the arrested subject to other
8  officers and I stopped there.
9  Q. Okay. Then what happened?
10  A. Then —
11  Q. I'm sorry. Let's take that — so there was a fence
12  behind you; correct?
13  A. Yes.
14  Q. And behind that fence were other law enforcement
15  people; correct?
16  A. Yes.
17  Q. There was squad cars back there; correct?
18  A. I'm not sure if there were squad cars or not.
19  Q. Well, there were vehicles where you could take a
20  suspect away; correct?
21  A. I believe so.
22  Q. And you handed the suspect to other law enforcement;
23  correct?
24  A. Yes, I think so.
25  Q. And behind that barricade is where the law — some

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
www.alaris.us
Fax: 314.644.1334

## WILLIAM OLSTEN  9/3/2021

### Page 69

1  law enforcement was; correct?
2     A.  Yes.
3     Q.  And there was law enforcement standing next to you;
4  correct?
5     A.  Yes.
6     Q.  In fact, Officer Zajac is standing directly to your
7  left; correct?
8     A.  At that time I don't believe Zajac was standing to
9  my left.  The only one I remember standing next to me was
10  Sergeant Bartlett.
11     Q.  Okay.  Sergeant Bartlett was near you.  And in that
12  area at the time Major Hayden was right there; correct?
13     A.  Yes, he was in the area.
14     Q.  And there were other members of the Special
15  Operations Team; correct?
16     A.  Yes.
17     Q.  And there were other members of the St. Louis Police
18  Department; correct?
19     A.  Yes.
20     Q.  And a lot of them were behind the fence directly
21  behind you; correct?
22     A.  Some of they were behind the fence I believe, yes.
23     Q.  And some of them were in front of you, some of them
24  were to your left; correct?
25     A.  I remember Bartlett being to my left but apart from

### Page 70

1  that I'm not sure where everybody was.  They were mostly to
2  the back.
3     Q.  And I could show you the video right now but I'll
4  just tell you that Officer Zajac is within like two feet of
5  you to your left.
6     A.  Okay.
7     Q.  Okay.  When you use pepper spray how are you trained
8  to use it?  What are you supposed to do with it?
9     A.  Point it at someone's face and spray in a sweeping
10  motion.
11     Q.  When you say a sweeping motion, how much of a
12  sweeping motion?
13     A.  I don't know exactly how many feet.
14     Q.  Well, if there's somebody let's say -- you know, in
15  the video you see Mr. Brandy probably about six or seven feet
16  in front of you; right?
17     A.  Yes.
18     Q.  How much based on your knowledge were you supposed
19  to sweep that pepper spray?
20     A.  Enough to get the desired effect.
21     Q.  Did you receive any training about not sweeping it
22  to that -- far enough that you start hitting people four or
23  five, six feet away?
24     A.  Not that I recall.
25     Q.  So you've received no training regarding that?

### Page 71

1     A.  Not that I recall.
2     Q.  Do you recall ever being trained on trying to
3  minimize the effect of pepper spray to not hit other people
4  that you are not targeting?
5     A.  I believe that's in the special order.
6     Q.  Okay.  Who were you targeting with the pepper spray?
7     A.  Amir Brandy.
8     Q.  So you were targeting one person?
9     A.  I believe I was targeting one person but also there
10  was a large crowd, I was trying to get them to back up as
11  well.
12     Q.  You were trying to get them to back up.  Were you --
13  after you pepper sprayed Mr. Brandy did you make any attempts
14  to effectuate any arrest?
15     A.  No, I did not.
16     Q.  Okay.  So you were trying to get the crowd to back
17  up?
18     A.  Yes.
19     Q.  Previous -- immediately previous to spraying the
20  crowd did you give any verbal warnings?
21     A.  Several.
22     Q.  And those would be caught on video, though; correct?
23     A.  Yes.  On the video you can hear me saying get back
24  several times.
25     Q.  Did anybody else attempt to make an arrest after you

### Page 72

1  pepper sprayed these people?
2     A.  No.
3     Q.  Did you make, did any -- did you make any attempts
4  to decontaminate the people?
5     A.  No.
6     Q.  Do you know of any specific St. Louis Police
7  policies about decontaminating people who have been pepper
8  sprayed?
9     A.  It applies to subjects who are in custody, yes.
10     Q.  After you pepper sprayed people did you retreat?
11     A.  No.
12     Q.  Did you go to try to find a safer location?
13     A.  No.
14     Q.  Were you trying to extract yourself from the area?
15     A.  No.  It had the desired effect to back the crowd up.
16     Q.  So your purpose for this was to just back the crowd
17  up; correct?
18     A.  Back the crowd up and stop the threat of Amir
19  Brandy.
20     Q.  What threat was Amir Brandy?  I mean, in the video
21  you see him cursing but what was he doing other than cursing?
22     A.  Well, it was his manner of cursing were actual
23  verbal threats.  He kept saying that he was going to assault
24  me.  And despite being told to get back several times he
25  continued to advance on me.

ALARIS LITIGATION SERVICES
www.alaris.us     Phone: 1.800.280.3376     Fax: 314.644.1334

WILLIAM OLSTEN  9/3/2021

## Page 73

1 Q. So is it your testimony that at the point that you
2 sprayed him he was advancing on you?
3 A. Yes.
4 Q. And in fact what Mr. Brandy was saying was, if you
5 spray me I will fuck you up; correct?
6 A. No. He was saying he was going to fuck me up pretty
7 much the entire time he was yelling at me.
8 Q. Um-hmm. Did you ever see him -- what were in --
9 what was in Mr. Brandy's hand when he was saying this?
10 A. I believe his phone was.
11 Q. Did he have any weapons?
12 A. Not that I saw.
13 Q. Did he lift his arms in a striking manner like he
14 was going to punch you?
15 A. I don't recall.
16 Q. So there was making what you call verbal threats.
17 What physical attempts did he make to make physical contact
18 with you?
19 A. Again after ignoring several commands to get back he
20 kept advancing on me.
21 Q. So he was advancing on you.
22 A. Yes.
23 Q. And you would expect that to be seen on the video;
24 correct --
25 A. Yes.

## Page 74

1 Q. -- that he was advancing?
2 Are people allowed to curse at police officers?
3 A. Yes, they are.
4 Q. Are people allowed to criticize police officers?
5 A. Yes, they are.
6 Q. Are people allowed to make verbal threats to police
7 officers?
8 A. No, they're not.
9 Q. Why?
10 A. Well, for the same reason you can't verbally threat
11 anyone.
12 Q. So after you pepper spray the crowd what do you do?
13 A. Then I just -- I stand there and additional officers
14 respond and arrive on scene, and I believe the CDT team was
15 requested and we extracted ourselves after the CDT team was
16 there.
17 Q. Before you use your pepper spray did you give any
18 commands directing people specific directions that they need
19 to go to remove themselves from the area?
20 A. I just told them to get back.
21 Q. Did you point out any routes of egress that they
22 must take?
23 A. No, I did not.
24 Q. Other than Mr. Brandy doing the verbal threats what
25 else was going on?

## Page 75

1 A. The crowd was angry. A lot of screaming, yelling.
2 There was some items thrown. I got hit with a bottle at some
3 point during this event.
4 Q. Before or after the spray was used?
5 A. I believe -- it might have been after.
6 Q. Before the spray was used you said that the crowd
7 was yelling and angry. What else was going on?
8 A. They were also ignoring commands to get back. They
9 kept advancing on my position.
10 Q. And your position is that you did not move towards
11 the crowd; correct?
12 A. Once I got to the spot where the arrested subject
13 was relinquished to other officers I stopped at that -- at
14 that spot.
15 Q. And you took no -- after you handed off the subject
16 you took no forward movements; correct? You handed off the
17 subject and you froze where you were?
18 A. Handed off the subject and stopped, yeah, close to
19 that fence there. I didn't charge the subjects or anything.
20 Q. Did you ever take any steps towards anybody?
21 A. I don't recall taking any steps to anybody.
22 Q. Okay. You have a cross-claim in this lawsuit. Can
23 you tell me what that's about?
24 MR. MILLIKAN: I'll object to the extent -- to the
25 extent you're asking for a legal conclusion.

## Page 76

1 Other than that, if you understand what the
2 cross-claim is, Bill, go ahead and answer.
3 THE WITNESS: No. I would just refer to you, Brian,
4 if you wanted to explain the cross-claim, but I don't
5 have the particulars of that.
6 Q. (By Mr. Khazaeli) I believe that one of your
7 allegations in your cross-claim is that everything that you
8 were doing that night you were doing because that's how you
9 were told to do things; correct?
10 A. It's possible, yes.
11 Q. That wasn't that you are -- that you were acting
12 rogue. I think -- I'm going to try to pull it, give me a
13 second. I'm going to search for this while this is going on
14 in the background.
15 But in this case --
16 MR. MILLIKAN: If I could just interrupt, the
17 language says in the course and scope of his duty if
18 that's what you're looking for.
19 MR. KHAZAELI: Thanks, Brian.
20 Q. (By Mr. Khazaeli) You've made the allegation that
21 everything that you did was within the course and scope of
22 your duty; correct?
23 A. Yes.
24 Q. What does that mean to you?
25 A. It means I followed the Department's policies and

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## WILLIAM OLSTEN  9/3/2021

### Page 77

1  procedures as they're outlined.
2     Q.  Do you know what the term ratified means?
3     A.  No, I don't.
4     Q.  So that means that sometimes your bosses can do
5  things that will lead you to believe that what you did was
6  proper.  Right?
7        So as an example, let's say you arrest somebody and
8  afterwards they give you a commendation.  That tells you you
9  did a good job; correct?
10    A.  Yes.
11    Q.  Right.  After you pepper sprayed the crowd what did
12  Sergeant Bartlett say to you?
13    A.  I don't remember him saying anything to me.
14    Q.  Do you remember him asking you what happened?
15    A.  No.
16    Q.  Do you remember him at any point -- at any point
17  questioning you as to why you did that?
18    A.  I don't remember him asking me that, no.
19    Q.  Did he ask you how you were doing, were you doing
20  okay?  Do you remember any conversations with your direct
21  supervisor after this happened?
22    A.  I don't remember what we discussed.
23    Q.  Do you remember having any discussion at all?
24    A.  I don't remember.
25    Q.  Based on everything that happened that night you

### Page 78

1  believe that your actions were consistent with what your
2  supervisors wanted you to do?
3     A.  Yes, I do.
4     Q.  That you were acting exactly how you were trained to
5  act as a St. Louis police officer?
6     A.  Yes.
7     Q.  I'm going to put up a different document right now.
8  Okay?  This is your snapshot.  So this is previously marked as
9  City's 00001 through 4 in Aldridge.  This is your IAD history.
10  Okay?
11    A.  Okay.
12    Q.  Now, this is just what shows up in your IAD stuff.
13  I'm assuming that you've had other complaints that don't show
14  up so I'm going to ask you about those generally.  Okay?  So
15  I'm going to share the screen.
16        And I'm not marking these as exhibits just because
17  they're previously, you know, they've already been.  But let's
18  go through here.
19        Your first complaint against you is in
20  September 16th, 2010 where you were accused of misusing
21  Department computer systems and you received a written
22  reprimand.  It says numerous employees forwarded a chain
23  letter through the Department's email system.  What was that
24  about?
25    A.  I don't even remember receiving a written reprimand

### Page 79

1  from that.  Until reviewing this document I wasn't aware that
2  that ever even happened.
3     Q.  Okay.  But what happened?  What was it about?  What
4  was the email?
5     A.  I have no idea.
6     Q.  You don't recall ever being a part of an
7  investigation in 2010 regarding an email?
8     A.  Not at all.
9     Q.  Nobody ever came to speak to you about this?
10    A.  Nope.
11    Q.  So what you're telling me is that there's something
12  in your IAD file right here that you don't recall IAD or
13  anybody ever talking to you about?
14    A.  Correct.
15    Q.  And you have no knowledge of a written reprimand on
16  May 18th, 2011?
17    A.  No.  Again, until seeing this form I had no idea
18  that that was even in there.
19    Q.  Well, what's your reaction to the fact that it looks
20  like you got a written reprimand that nobody told you about?
21    A.  My reaction to that is that they either just put it
22  in there or it's an error or where they just gave these out to
23  a lot of people and didn't tell anyone.
24    Q.  Right.  But I mean, do you have a -- are you okay
25  with that?  Like do you have a reaction to that?  Does it

### Page 80

1  bother you?  How do you feel about the fact it looks like you
2  have a written reprimand in your file that you knew nothing
3  about?
4     A.  I'm indifferent to it.  I don't work there anymore.
5     Q.  If you still worked there how would you feel about
6  that?
7        MR. MILLIKAN:  I'll object.  It calls for
8  speculation.
9        Go ahead and answer if you know.
10    A.  I don't know.  Again --
11    Q.  (By Mr. Khazaeli)  What I'm trying to get to -- I
12  mean, I'll just tell you this:  I worked in the government for
13  a long time.  If I had something in my file that was negative
14  about me that nobody told me about and it showed up it would
15  bother me.
16        I guess my question is:  Does it bother you that
17  there is some negative complaint against you that you knew
18  nothing about that you had no chance to defend yourself on?
19    A.  Yeah, I guess it does.
20    Q.  Let's go to this December 31st, 2010.  It says a
21  DARB was sustained.  What's a DARB?
22    A.  I have no idea.
23    Q.  Do you know --
24        MR. MILLIKAN:  Javad, it's a Department Accident
25  Review Board is what that stands for.

## WILLIAM OLSTEN  9/3/2021

### Page 81

1   Q. (By Mr. Khazaeli) Okay. And I was going to get to
2   that. Down here it says chargeable accident. So this is
3   usually -- would a DARB be something that involves your motor
4   vehicle?
5   A. Yes.
6   Q. Do you remember what this late 2010 DARB incident
7   was? It would have been on New Year's Eve.
8   A. No, I sure don't.
9   Q. Let's talk about this July 24th, 2010 incident.
10  Okay? This says that you received written reprimand for
11  failing to attend grand jury. What was that about?
12  A. Yeah, I believe I just forgot to go to a grand jury
13  hearing.
14  Q. And the incident actually occurred in July of 2012;
15  correct?
16  A. It looks like it, yes.
17  Q. Do you know why it took almost two years for you to
18  get the written reprimand?
19  A. No, I don't.
20  Q. Did you challenge this, this discipline?
21  A. I don't recall challenging it.
22  Q. You don't recall filing a grievance regarding this?
23  A. No.
24  Q. So without filing a complaint -- I'm sorry, without
25  fighting this it still took about a year and a half for this

### Page 82

1   written reprimand to occur; correct?
2   A. It looks like it.
3   Q. What about this, summary hearing requested,
4   November 6th? Do you know what that means?
5   A. No.
6   Q. Would a summary hearing be someplace where you are
7   asking to fight your complaint? Have you ever heard of the
8   term summary hearing before?
9   A. Yes. Yes, it's possible.
10  Q. All right. So it's possible you decided to
11  challenge this complaint; correct?
12  A. I mean, it's possible. It's nine years ago.
13  Honestly I don't remember.
14  Q. Well, I guess here's the question: During your ten
15  years as a police officer how often did you request a hearing
16  regarding a complaint against you?
17  A. I don't remember.
18  Q. Was it a lot, was it once or twice? Do you recall
19  any?
20  A. Could have been once or twice maybe.
21  Q. Let's go to this 2015 incident. Police vehicle
22  maintenance and non-emergency operation. Chargeable accident.
23  Do you remember what this accident was about?
24  A. Let's see. No, I don't remember that accident.
25  Q. All right. Let's get to January 2016 was the

### Page 83

1   complaint date but it's from November 4th, 2015. Person
2   alleged that their dog was shot. What happened in this dog
3   shooting?
4   A. I believe it was during a search warrant. They had
5   a dog that was off the leash in the front yard and it --
6   charging.
7   Q. Who shot the dog?
8   A. I shot the dog.
9   Q. Have you ever received any training as to how to
10  deal with a dog that's on its own property?
11  A. Well, it was off the leash and I was in the middle
12  of the street when I shot it so I wasn't on its property.
13  Q. Was the dog on its property before you guys began to
14  execute the search warrant?
15  A. I believe so.
16  Q. All right. And it was off its leash on its own
17  property; correct?
18  A. Yes.
19  Q. Was the property fenced?
20  A. It was in the front of the street. No, it was -- it
21  was just sitting up on the porch I believe whenever we were
22  there.
23  Q. The dog was sitting on its porch when -- and would
24  this have been the Special Operations Team?
25  A. Yes.

### Page 84

1   Q. And when the Special Operations Team goes to search
2   a warrant how are you guys dressed?
3   A. We're in plainclothes but we wear ballistic, you
4   know, black ballistic vests that say Police across the front
5   and back and we have a duty belt on and typically a badge on.
6   Q. And I'm assuming that when you go to serve a warrant
7   like this it's not a slow action, it's kind of shock and awe,
8   you come in quickly and try to take over the area; right, for
9   officer safety?
10  A. Depending on the type of warrant it can be fast,
11  yes.
12  Q. Do you remember how the Police Department delivered
13  this warrant?
14  A. I don't remember. It wasn't my search warrant so
15  I'm not sure.
16  Q. Well, I guess how many times during your career have
17  you discharged your weapon?
18  A. A few times.
19  Q. What's a few times?
20  A. There was once in 2012, the miss incident. I was
21  involved in a shooting in -- I can't remember what year it
22  was, might have been -- might have been 2016 or '17. Maybe it
23  was '17. Yeah. And I think that was it.
24  Q. So three times. Can you any other times -- was that
25  the Bomber O'Brien incident. And any other times that you've

**ALARIS LITIGATION SERVICES**
Phone: 1.800.280.3376

www.alaris.us                                                    Fax: 314.644.1334

## WILLIAM OLSTEN  9/3/2021

### Page 85

1  fired your weapon at somebody while you were on duty?
2     A.  Like I said, this one was a dog.
3     Q.  Right.
4     A.  But I had one in Rapid -- when I was in Rapid
5  Deployment Unit in 2012 and then I think it was 2017.
6     Q.  So three times during your ten-year career?
7     A.  I think so, yes.
8     Q.  So these were -- firing your weapon you would agree
9  with me is kind of a big deal; right?
10    A.  Absolutely.
11    Q.  Not something you want to do all the time.
12    A.  No.
13    Q.  It's a big deal, you know, like at that point I
14  would assume that you thought that you were at some kind of
15  risk to your safety or your life or somebody else's; right?
16    A.  Yes.
17    Q.  And the Force Investigation Unit comes out after a
18  shooting; correct?
19    A.  Correct.
20    Q.  And you tell them everything that occurred; right?
21    A.  Yes.
22    Q.  So what do you remember about how you guys served
23  the warrant in this case?
24    A.  I don't remember how it was served.  I just remember
25  I was in the front of the house in the street when this

### Page 86

1  occurred.
2     Q.  And so the team goes then to serve a warrant, a dog
3  runs away and runs into the street.  Then what happens?
4     A.  Yeah.  It runs towards me, charging, growling and
5  its mouth open and it gets basically right next to me, that's
6  when I ended up shooting it.
7     Q.  Now, so now that we know the whole area, what kind
8  of training have you received previous to that about dealing
9  with dogs?
10    A.  I don't remember specific training on dealing with
11  dogs.
12    Q.  You would agree with me that a lot of people own
13  dogs; right?
14    A.  Yes.
15    Q.  Do you remember ever receiving any training from the
16  Police Department on how to deal with a dog?
17    A.  I don't recall receiving training on it.
18    Q.  Do you recall you ever receiving any training from
19  the Police Department about when you can shoot and kill a dog
20  that's coming at you?
21    A.  I don't recall.
22    Q.  Give me one second.  What kind of investigation was
23  done after you -- this shooting occurred?
24    A.  In reference to?
25    Q.  The dog shooting.  What did the IAD do?

### Page 87

1     A.  I don't know if they did anything.  I believe there
2  was a complaint from the dog's owner but I never -- I may have
3  been questioned by them.  I'm not sure if I was on not.
4     Q.  You don't remember ever being questioned by them?
5     A.  I don't recall if I was questioned or not.
6     Q.  Do you remember ever being asked about your badge
7  number?
8     A.  No.
9     Q.  Have you ever told somebody -- have you ever refused
10  to give somebody your badge number?
11    A.  No, I have not.
12    Q.  Have you ever told somebody to shut up while you
13  were working?
14    A.  No, I have not.
15    Q.  Have you ever used derogatory language towards
16  somebody while you were working?
17    A.  No.
18    Q.  So in your eleven-year career the first time you
19  ever used any curse words towards somebody is when Amir Brandy
20  was cursing at you?
21    A.  Yeah.  I don't recall any other times in that.
22    Q.  Whole career.  Never another time.
23    A.  Not that I recall, no.
24    Q.  Okay.  You said that you were involved in a shooting
25  with the Rapid Response Team.  That's not on here.  What

### Page 88

1  happened in that shooting?
2        MR. MILLIKAN:  I'm going to stop it here.  Bill,
3  I'll advise you on any shootings of individuals that
4  you've not received a declination letter on from the
5  Prosecuting Attorney's Office not to answer those
6  questions and assert your Fifth Amendment privilege.
7     Q.  (By Mr. Khazaeli)  Did you hear what your attorney
8  said?
9     A.  Yes.
10    Q.  Are you going to do that?
11    A.  Yes, I'll do what my attorney tells me to.
12    Q.  I'm going to once again try to ask you some general
13  questions because I'm just trying to figure out about this.
14        The person that you shot, did that person die?
15    A.  No.
16    Q.  Do you know if any lawsuits were filed as a result
17  of that?
18    A.  No.
19    Q.  Do you know if any complaints were filed as a result
20  of that?
21    A.  No.
22    Q.  Do you know what ended up happening, was that person
23  charged?
24    A.  Yes.
25    Q.  Do you know what the charge was?

22 (Pages 85 to 88)

## Page 89

1    A. He was in -- just car-jacked a car, I'm not sure
2  what his charges were exactly.
3    Q. Do you recall sitting here today, without getting
4  into the details of what you did that day, what the name of
5  the person was?
6    A. No, I sure don't.
7    MR. KHAZAELI: And Abby, we would expect any
8  documents related to this and any, you know, use of force
9  and any complaints against him to be produced. Under
10  whatever confidential rules we've got going on. Okay?
11  I'm going to move on.
12    MS. DUNCAN: We have them.
13    MR. KHAZAELI: I'm sorry, what did you say, Abby?
14    MS. DUNCAN: You'll supplement that.
15    MR. KHAZAELI: Thank you. Okay. And I think we
16  want all of the documents related to this dog shooting,
17  too. And any other complaints whether or not they were
18  sustained.
19    Q. (By Mr. Khazaeli) Let's go to this August 2018
20  incident. Okay? This is listed officers were involved in an
21  off duty incident that involved one officer being shot with
22  another civilian. This is Bob O'Brien's incident; correct?
23    A. Yes.
24    Q. And this is the incident you already asserted your
25  Fifth Amendment rights on; correct?

## Page 90

1    A. Yes.
2    MR. KHAZAELI: Once again, Abby, we'd like all the
3  documents for that, too.
4    Q. (By Mr. Khazaeli) Now, this is one that I hadn't
5  seen before. January 17th, 2019. On January 17th while on
6  duty the listed officer who is detached to the Communications
7  Division -- I think when we saw your group you were on the
8  Communications Division; correct?
9    A. Yes.
10    Q. You received a random drug/alcohol screening. And
11  I'm assuming this is talking about you; right?
12    A. Yes.
13    Q. And that your blood alcohol level was.062. And that
14  you had a second blood alcohol level of .053; correct?
15    A. Yes.
16    Q. Okay. What happened in that incident?
17    A. Basically I came to work and they said, hey, it's
18  your random, random drug test today. I went to BarnesCare and
19  took their test and then while you're there they also do the
20  blood alcohol tests.
21    Q. What time of day did you go to work that day?
22    A. I believe it was 2:00 o'clock in the afternoon.
23    Q. And at what point after you were at work were you
24  told that you had a random drug test, an alcohol test?
25    A. It was immediately.

## Page 91

1    Q. Okay. And were you at the Special Operations
2  building on Manchester when this occurred?
3    A. No. I was in the Communications Division.
4    Q. And where -- I'm sorry, is that at the headquarters
5  on Olive?
6    A. No. It's the building where the dispatchers are.
7    Q. Where is that?
8    A. Next to the Police Academy.
9    Q. I always get confused. Is the police -- where is
10  the Police Academy now? Is that in the old Police
11  Headquarters by the -- by City Hall?
12    A. Yes. So it's on the opposite side of that block so
13  if you know where the Federal Building is, it's directly --
14    Q. Yeah.
15    A. -- across the street from the Federal Building
16  there.
17    Q. On Tucker; right?
18    A. On -- yeah.
19    Q. Tucker and Clark; right?
20    A. Tucker and Clark. Yes.
21    Q. Directly south is the Young Federal Building and
22  across the street is that -- directly east of it is the big
23  Fire Department thing; right?
24    A. Correct, yes.
25    Q. Okay. That's what I thought.

## Page 92

1    So you're there, you get told and then what do you
2  do?
3    A. Then I go to BarnesCare.
4    Q. All right. Where is BarnesCare located?
5    A. At Manchester and like Kingshighway.
6    Q. Okay. Do you go by yourself?
7    A. Yes.
8    Q. You drive yourself.
9    A. Yes.
10    Q. Once you walk into BarnesCare what happens?
11    A. Then you check in and then they administer the test.
12    Q. How long does it take for them to administer the
13  test? Like how long -- do you remember how long you waited
14  before you went in?
15    A. Not long. So they have like a separate room there
16  for like law enforcement or City employees that they kind of
17  take you straight back whenever you get checked in there.
18    Q. Okay. And were you armed at the time?
19    A. I believe so.
20    Q. When you're at Communications they didn't take your
21  gun from you; right?
22    A. Correct.
23    Q. Okay. So you drive down there. You've got your
24  weapon on you. Then what happens?
25    A. Then I get checked in and administer the test.

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
www.alaris.us                    Fax: 314.644.1334

## WILLIAM OLSTEN  9/3/2021

### Page 93

1  Q. Were you worried when you went in to the test?
2  A. No.
3  Q. Had you been — I mean, according to these results
4  you had been drinking earlier in the day; right?
5  A. It was early that morning basically from the night
6  before, before I went to sleep.
7  Q. What time did you go to sleep?
8  A. Like 5:00 a.m.
9  Q. So 5:00 in the a.m. and you drank until 5:00 a.m.?
10  A. Yes.
11  Q. How much do you weigh?
12  A. 180 pounds.
13  Q. So 180 pounds and now we're talking you went to work
14  at 2:00. About what time do you think you had your blood
15  alcohol taken?
16  A. You'd have to look at the form, sir. I don't
17  remember exactly what time it was.
18  Q. Well, roughly, you know. Just play this out.
19  MR. KHAZAELI: Well, actually, Abby, I'd like to
20  have all these forms produced, too.
21  Q. (By Mr. Khazaeli) You say you got to work at 2:00,
22  did a half hour, an hour later, how long do you think it
23  was until you —
24  A. Yeah. Maybe an hour later, hour and a half later.
25  Q. Let's say —

### Page 94

1  A. Hour.
2  Q. Let's say an hour instead of hour and a half so
3  we're at 3:00 o'clock now. You went to bed at 5:00 a.m.
4  Where were you drinking the night before?
5  A. I'm trying to remember where we were. I might
6  have — I think I was at —
7  Q. You said —
8  A. — Bar 101 at Soulard —
9  Q. — where we were —
10  COURT REPORTER: One at a time, please.
11  Q. (By Mr. Khazaeli) Sorry. You said Bar 101 at
12  Soulard and then?
13  A. I think I was there and then at home I drank.
14  Q. Who were you with?
15  A. I don't even remember who I was with that night. If
16  anyone.
17  Q. So you might have been at home drinking by yourself?
18  A. I know I was at home by myself, yeah.
19  Q. Was it common that you would drink by yourself at
20  home?
21  A. Sometimes.
22  Q. How often?
23  A. I don't — I don't remember how many. I mean, how
24  often.
25  Q. Once a week, once a month, once a year? Estimate

### Page 95

1  for me.
2  A. Once a week possibly.
3  Q. Okay. And how often would you stay out drinking
4  until or be drinking until 5:00 in the morning?
5  A. Probably once a week.
6  Q. When you were at Bar 101 who were you with?
7  A. I don't remember if I was with anyone.
8  Q. But you might have been drinking by yourself at Bar
9  101?
10  A. It's possible.
11  Q. Could you have been with any police officers that
12  night?
13  A. I could have been.
14  Q. So how much did you say you weigh?
15  A. 180 pounds.
16  Q. And eight hours later your blood alcohol level was
17  .06?
18  A. .053, yes.
19  Q. Well, that was the second rating. The first one
20  said .062 actually; right?
21  A. Yes.
22  Q. Okay. Are you given any training — well, how many
23  drinks do you think you had the night before?
24  A. I think I had a couple at the bar and then I had a
25  few, several at home.

### Page 96

1  Q. What's a few, several?
2  A. I don't, I don't remember.
3  Q. Give me a rough estimate.
4  A. I think I was drinking whiskey at home. Had a few
5  whiskey glasses.
6  Q. So when you say a few, how many?
7  A. Three maybe.
8  Q. So you think you had a total of five drinks then
9  between going out to the bar and 5:00 in the morning; correct?
10  A. Maybe. Yeah, I mean, I don't remember exactly.
11  Q. Well, are you trained on blood alcohol levels?
12  A. We receive training in the Academy but that's about
13  it.
14  Q. And do you know how many drinks it takes an hour to
15  increase somebody's blood alcohol level?
16  A. I don't recall, it's been so long since we've had
17  any training on that.
18  Q. Have you received any training on how much time it
19  takes for alcohol levels to go down?
20  A. I'm not an expert at all, no.
21  Q. You said that you would possibly drink until 5:00 in
22  the morning about once a week. During how much of your career
23  would you do that?
24  A. Whenever this happened, probably just the last two
25  or three years.

24 (Pages 93 to 96)

WILLIAM OLSTEN  9/3/2021

## Page 97

1  Q.  So this happened in January of 2019; correct?
2  A.  Yes.
3  Q.  And the incident that we're talking about at Busch
4  Stadium occurred in September of 2017; correct?
5  A.  Correct.
6  Q.  Doing my math, that's one year and four months
7  beforehand; correct?
8  A.  Yes.
9  Q.  That's during the period where you on a weekly basis
10  would drink until 5:00 in the morning; correct?
11  A.  Yes.
12  Q.  Okay.  And when you would drink until 5:00 in the
13  morning while you were on Special Ops did you ever go to work
14  the next day?
15  A.  Yes.
16  Q.  Did you ever go to work in the morning the next day?
17  A.  It's possible.  I don't remember.
18  Q.  Often your warrants on Special Ops are executed in
19  the morning; right?
20  A.  Yes.
21  Q.  And that was during the time that you were often
22  drinking until 5:00 in the morning; correct?
23  A.  Yes.
24  MR. MILLIKAN:  I'm going to -- I'm going to object
25  to that question.  Misstating the prior testimony.  You

## Page 98

1  said often.  So I would object on that basis.
2  Bill, if you know the answer you can answer.
3  Q.  (By Mr. Khazaeli)  I think you've already answered
4  yes; right?
5  A.  Yeah, it was during that time, yeah.
6  Q.  Based on police training, can a police officer be on
7  duty with their gun with any alcohol in their system?
8  A.  Yeah, actually -- no, I don't believe they can.  No.
9  Q.  Do you know somebody named Christopher Tanner?
10  A.  I know -- I know who he is but I don't know him
11  personally.
12  Q.  How about Jason Stockley?
13  A.  Again I know who he was but I don't know him
14  personally.
15  Q.  Now, Mr. Stockley, have you heard the allegation
16  that Mr. Stockley drove around with a personal weapon in his
17  vehicle?
18  A.  I'm not aware of that.
19  Q.  Have you ever -- you've been spoken to before about
20  bringing your personal weapon to work; haven't you?
21  A.  No.
22  Q.  You don't own an AR-15?
23  A.  Yes, I do own an AR-15.
24  Q.  And you've never brought that AR-15 to work?
25  A.  I don't believe so, no.

## Page 99

1  Q.  You said that kind of -- are you sure you've never
2  brought your AR-15 to work?
3  A.  Yeah, I've never brought it to work, no.
4  MR. KHAZAELI:  Let's take ten just so I can loop
5  back and make sure I didn't miss anything.  Okay.  We'll
6  be out of here before lunch, before noon.
7  THE VIDEOGRAPHER:  We're going off record 11:14 a.m.
8  (Whereupon, there was a break in the proceedings
9  from 11:14 a.m. to 11:21 a.m.)
10  THE VIDEOGRAPHER:  Back on the record 11:21 a.m.
11  Q.  (By Mr. Khazaeli)  I just wanted to loop back
12  through a few things.
13  You said that you were involved in a shooting when
14  you were on Rapid Response, you were involved in the shooting
15  involving the dog.  There was a third shooting; right?
16  A.  Yes.
17  Q.  All right.  I'm assuming that your attorney's going
18  to advise you the same thing regarding that shooting.
19  MR. KHAZAELI:  Correct, Brian?
20  MR. MILLIKAN:  That's correct.
21  Q.  (By Mr. Khazaeli)  So I'm not going to get into the
22  specifics of the shooting too much but do you remember the
23  name of the person who was shot?
24  A.  I think his name was Tyrone Smith.
25  Q.  And did Mr. Smith survive the shooting?

## Page 100

1  A.  Yes.
2  Q.  Was Mr. Smith charged with anything?
3  A.  Yes.
4  Q.  Do you know what he was charged with?
5  A.  I don't recall.
6  MR. KHAZAELI:  Abby, we're going to want the
7  documents regarding that shooting.
8  Q.  (By Mr. Khazaeli)  Other than Force Investigation
9  did anybody from IAD ever come and talk to you about that
10  shooting?
11  A.  No.
12  Q.  Did Force Investigation come and talk to you about
13  that shooting?
14  A.  Yes.
15  Q.  And since it's not showing up on your snapshot I'm
16  assuming that they determined that was a justified shooting.
17  A.  Yes.
18  Q.  Have you since leaving the St. Louis Police
19  Department applied for jobs with any other police departments?
20  A.  Just recently, yes.
21  Q.  Where?
22  A.  I applied for the Sheriff's Office in Jefferson
23  County.
24  Q.  And why did you pick JeffCo Sheriff's Office?
25  A.  That's where I live.

25 (Pages 97 to 100)

## Page 101

1    Q.  Is that anything -- isn't that where Sergeant
2    Rossomanno works?
3    A.  Yes.  Yes, he does.
4    Q.  Did he have anything to do with you applying for
5    that job?
6    A.  No.
7    Q.  When did you apply for the job at Jefferson County?
8    A.  It's been a few months now.
9    Q.  Have you heard back?
10   A.  I've tested with them but I haven't heard anything
11   back.
12   Q.  Do you know if anybody -- did you list anybody from
13   the St. Louis Police Department as a reference for that job?
14   A.  Yes, I did.
15   Q.  Who?
16   A.  Captain Mike Mueller I think I put on there.
17   Q.  And is Mueller spelled M-u-e-l-l-e-r?
18   A.  Yeah.  I'm not positive if I put him on there but I
19   think I did.
20   Q.  Did you speak to Mr. -- to Captain Mueller before
21   you applied?
22   A.  Yeah.  I just asked him if I could put him on as a
23   reference.
24   Q.  And did he say yes?
25   A.  Yes.

## Page 102

1    Q.  Was Captain Mueller aware of you being disciplined
2    because of your -- because of blood alcohol level in your --
3    because of your blood alcohol level?
4    A.  I'm not sure.
5    Q.  Was Captain Mueller -- obviously because of the
6    press knew about the shooting at Bomber O'Brien's; correct?
7    MR. MILLIKAN:  I'm going to object.  It calls for
8    speculation.
9    Q.  (By Mr. Khazaeli)  Did you ever speak to Captain
10   Mueller about the shooter -- shooting at Bomber O'Brien's?
11   A.  No, not that I recall.
12   Q.  Before he agreed to give you a recommendation did he
13   ask you about the shooting at Bomber O'Brien's?
14   A.  Not that I recall.
15   Q.  Okay.  Do you know if you listed Sergeant Bartlett
16   as a reference?
17   A.  I don't believe I did.
18   Q.  Other than Captain Mueller did you list anybody else
19   as references?
20   A.  Not from the Police Department I don't think so.
21   Q.  When was the last time you spoke to Sergeant
22   Rossomanno?
23   A.  I saw him at the testing for Jefferson County I
24   guess it was probably three weeks ago.  Apart from that I
25   haven't spoken to him since -- since he was -- since I was

## Page 103

1    still a policeman.  I don't remember when.
2    Q.  Okay.
3    A.  Several years.
4    Q.  Let's go -- let's go back:  So the fact that you're
5    applying for these jobs, that leads me to believe -- and tell
6    me if I'm wrong -- that your POST license, your P-O-S-T
7    license, is still valid; correct?
8    A.  Yes, it is.
9    MR. KHAZAELI:  And POST, Lei Ann, is all
10   capitalized.
11   Q.  (By Mr. Khazaeli)  Do you know of any actions taken
12   against your POST license?
13   A.  I received a letter from them that said they have
14   looked at my disciplinary stuff.  However, that my POST was
15   still active and that they didn't find reason to suspend my
16   POST license.
17   Q.  Even though you had a blood alcohol level of between
18   .053 and .062 while at work with a gun?
19   A.  Yes.
20   Q.  Now, I'm looking back at that disciplinary record
21   and I'm a little bit confused.  You were terminated; correct?
22   You didn't resign; right?
23   A.  I resigned.
24   Q.  Okay.  So you resigned.  You actually -- you were
25   not terminated.

## Page 104

1    A.  Correct.
2    Q.  So when the report here says that you were
3    terminated, that's actually false; right?
4    A.  That's wrong.  Yeah.
5    MR. MILLIKAN:  Javad, I can clear this up for you if
6    you'd like.
7    MR. KHAZAELI:  I'm assuming that this is just he was
8    told he was going to be terminated and he resigned.
9    Right?
10   MR. MILLIKAN:  He was initially terminated, that was
11   reversed on appeal, and he then resigned after it was
12   reversed.
13   Q.  (By Mr. Khazaeli)  Let me ask this question, and
14   Mr. Olsten, if you don't know it I can get it from Brian:
15   When you were initially terminated do you remember
16   if it was for the Bomber O'Brien case, if it was for the blood
17   alcohol thing or if it was for both of them?
18   A.  Just the blood alcohol thing.
19   Q.  So no termination action was taken against you
20   because of the Bomber O'Brien --
21   A.  No.
22   Q.  -- case; correct?
23   A.  No.
24   Q.  And that blood alcohol case was reversed; correct?
25   A.  Yes, it was.

26 (Pages 101 to 104)

WILLIAM OLSTEN  9/3/2021

| Page 105 |
| --- |

1  Q. If it was reversed why did you then resign?
2      MR. MILLIKAN: And to the extent that -- I'm going
3  to object to the extent that some of this calls for
4  attorney-client communication. What he knows about it
5  was certainly communicated by me to him.
6      So I want to be careful about, Bill, you not talking
7  about what we talked about if that's possible to answer
8  that question.
9      Q. (By Mr. Khazaeli) And answer this question
10  generally as to what your mindset was. I don't want you to
11  give me any specific word for word conversation that you had
12  with Brian. Okay?
13      What was your mindset after your case was reversed?
14  And I'm assuming when it was reversed you could go back on
15  duty. Why did you choose to resign?
16      A. I don't want to work in the city anymore.
17      Q. So it was your choice to leave the Police
18  Department; correct?
19      A. Yes, it was my choice to resign.
20      Q. Do you remember who was on your panel when you
21  decided to fight the termination?
22      THE WITNESS: Brian, you would have to answer that.
23  I'm not sure.
24      MR. MILLIKAN: It wasn't a panel. It was appealed
25  to the Civil Service Commission.

| Page 106 |
| --- |

1      MR. KHAZAELI: Okay. The Civil Service Commission.
2      Q. (By Mr. Khazaeli) So the St. Louis Civil Service
3  Commission determined that you being on duty with a blood
4  alcohol level of .063 to .05 something with your weapon was
5  not grounds to terminate you as a police officer.
6      A. Yes.
7      Q. All right. And I think this is my last line of
8  questioning. Let's go back to the incident at Busch Stadium.
9  All right? And you've reviewed the video.
10      Major Hayden was there; right?
11      A. Yes.
12      Q. And Major -- and he was the white shirt that was the
13  highest rank person on site; correct?
14      A. Yes.
15      Q. I don't remember. Do you recall any other white
16  shirts on site?
17      A. Not that I recall.
18      Q. Sergeant Bartlett was there; right?
19      A. Yes.
20      Q. And he would have ranked below Chief Hayden;
21  correct?
22      A. Yes.
23      Q. I'm sorry, Major Hayden at the time; correct?
24      A. Yes.
25      Q. And I think I saw in the one of the videos

| Page 107 |
| --- |

1  Lieutenant Jemmerson was there, J-e-m-m-e-r-s-o-n --
2      A. Yes.
3      Q. -- right? And he would have been below Major
4  Hayden; correct?
5      A. Yes.
6      Q. And Major Hayden didn't use any pepper spray;
7  correct?
8      A. Not that I'm aware, sir.
9      Q. And Mr. Hayden -- Major Hayden did not direct you to
10  use any pepper spray; did he?
11      A. No.
12      Q. Did Mr. -- did Major Hayden ever come afterwards and
13  ask you what happened?
14      A. Not that I recall.
15      Q. Did he ever ask you if you were okay?
16      A. Not that I recall.
17      Q. Did he ever ask you about why you used the pepper
18  spray?
19      A. No.
20      Q. Did he ever ask you why you didn't try to arrest
21  somebody after using the pepper spray?
22      A. Not that I recall.
23      Q. Did he ever ask you why you didn't leave the area
24  after you used the pepper spray?
25      A. No.

| Page 108 |
| --- |

1      Q. Did anybody ever come to you in after action
2  scenario and talk to you about things you could have done
3  better?
4      A. No.
5      MR. KHAZAELI: That's all I've got.
6      MR. MILLIKAN: All right. Abby, do you have any?
7      MS. DUNCAN: I do.
8
9          EXAMINATION
10  BY MS. DUNCAN:
11      Q. Mr. Olsten, you were asked about the Ball-Bey
12  incident involving Officer Vaughan. Do you remember that
13  questioning?
14      A. Yes.
15      Q. Okay. Did you see Mr. Ball-Bey that day?
16      A. No, I did not.
17      Q. Did you go inside the house?
18      A. Yes, I did.
19      Q. And when -- at what point did you go into the house?
20      A. After SWAT cleared the house they relinquished it to
21  me and then I began my -- my search of the residence.
22      Q. At no point you saw Mr. Ball-Bey at that time?
23      A. Not at all, no.
24      Q. And if IAD were to call you in today and ask you
25  about Mr. Vaughan's shooting of Mr. Ball-Bey would you have

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## WILLIAM OLSTEN  9/3/2021

### Page 109

1  any information to provide them?
2      A.  No.  Like I said, I was in the front of the house
3  and they were in the rear so, I mean, I had no line of sight
4  of Ball-Bey, Vaughan or Chandler.
5      Q.  You were asked about allegations that were made
6  against Officers Wentzel, Vaughan, Chandler and Zajac; is that
7  right?
8      A.  Yes.
9      Q.  Do you have any personal knowledge about why
10  Mr. Wentzel would be on the exclusionary list?
11      A.  No, I don't.
12      Q.  Do you have any personal knowledge involving any of
13  the allegations of forgery brought against Officer Vaughan?
14      A.  No, I don't.
15      Q.  Do you have any personal knowledge of the
16  allegations against Mr. Chandler and his overdose?
17      A.  No, I do not.
18      Q.  Do you have any personal knowledge with respect to
19  Zajac's alleged seeking of drugs?
20      A.  No, I do not.
21      Q.  And if IAD would bring you in to interview you about
22  these allegations would you have any information to provide
23  them with?
24      A.  No, I would not.
25      Q.  With respect to your use of pepper spray on

### Page 110

1  September 29th at Busch Stadium, did anyone from the Police
2  Department tell you to use your pepper spray?
3      A.  No.
4      Q.  Did anyone from SLMPD order you to use your pepper
5  spray that night?
6      A.  No.
7      Q.  Before you used your pepper spray did you tell
8  anyone that you were going to use it?
9      A.  Not that I recall.
10      MS. DUNCAN:  That's all the questions I have.
11      MR. KHAZAELI:  Brian, you got anything?
12      MR. MILLIKAN:  Javad, do you have any followup?
13      MR. KHAZAELI:  Very short.
14
15      REEXAMINATION
16  BY MR. KHAZAELI:
17      Q.  You are a detective; correct?
18      A.  Yes the.
19      Q.  And you have investigated criminal activity before;
20  correct?
21      A.  Yes.
22      Q.  When you investigate criminal activity do you
23  interview people who are near the scene of alleged crimes?
24      A.  Sometimes.
25      Q.  And is it sometimes you find out they don't know

### Page 111

1  anything?  That's after you talk to them; correct?
2      A.  Yes.
3      Q.  Are you ever taught to assume that somebody doesn't
4  have personal information?
5      A.  I'm sorry, I don't understand the question.
6      Q.  All right.  Ms. Duncan asked you several times
7  whether you had any personal knowledge of incidents.  When you
8  were a detective and you were investigating a crime, did you
9  just assume other that people who were near the crime did not
10  have personal knowledge or did you take steps to confirm that
11  yourself?
12      A.  Typically we'd take steps to confirm that.
13      Q.  All right.  If you were in a — I'm going to give
14  you a hypothetical here and I'm just going to pre-object for
15  your attorney that this is speculation.
16      But let's say that you go into a criminal — into a
17  building.  Right?  Okay?  And there are nine people in the
18  building.  And six of the nine people have been accused of
19  committing some form of crime.  Right?
20      Would you as a detective investigate that whole
21  group to figure out why there's a group of people where six of
22  nine people are accused of criminal activity?
23      MR. MILLIKAN:  I'll object —
24      Q.  (By Mr. Khazaeli)  That would be interesting —
25      MR. MILLIKAN:  I'll object for the record just so

### Page 112

1  it's clear.
2      Q.  (By Mr. Khazaeli)  That would be interesting to you
3  as a detective; correct?
4      A.  Yeah.
5      Q.  Right.  You would want to know more about that;
6  correct?
7      A.  Yes.
8      Q.  You would want to ask everybody in that building
9  what they knew about the other people; correct?
10      A.  Yes.
11      Q.  You would fully investigate that; correct?
12      A.  Typically, yes.
13      Q.  You wouldn't just assume that all of the nine people
14  had no personal knowledge of what the other people did;
15  correct?
16      A.  Yes.
17      Q.  And even if the people told you they had no personal
18  knowledge you would conduct an additional investigation to
19  confirm that that was true; correct?
20      A.  Possibly, yes.
21      Q.  All right.  When you're investigating people you
22  just don't always trust what they say; correct?
23      A.  Not always.
24      Q.  All right.  You do independent investigations to get
25  more information; correct?

28 (Pages 109 to 112)

WILLIAM OLSTEN  9/3/2021

Page 113

1    A.  Yes.
2    Q.  Has anybody asked, ever asked you for your text
3    messages between you and Officer Zajac?
4    A.  No.
5    Q.  Has anybody ever asked for text messages between you
6    and Officer Boone?
7    A.  I don't believe I've ever texted Officer Boone.
8        THE COURT REPORTER:  I'm sorry.  Officer Boone?
9        MR. KHAZAELI:  Boone.  Boone.
10   Q.  (By Mr. Khazaeli) Has anybody ever asked you if
11   you've ever texted with Officer Boone?
12   A.  No.
13   Q.  Has anybody ever asked you for any correspondence
14   between you and Officer Vaughan?
15   A.  No.
16   Q.  Has anybody ever asked you for any correspondence
17   between you and Officer Chandler?
18   A.  No.
19   Q.  You and Officer Wentzel?
20   A.  No.
21   Q.  You and Officer Thacker?
22   A.  No.
23   Q.  Has anybody, other than me today, has anybody ever
24   investigated or spoke to you about anything regarding those
25   other people that I just named?

Page 114

1    A.  Not that I'm aware of.
2    Q.  That includes IAD; correct?
3    A.  Correct.
4    Q.  That includes your chain of command; correct?
5    A.  Correct.
6    Q.  That includes the Criminal Division of the Police
7    Department that could be doing an investigation; correct?
8    A.  Correct.
9    Q.  That includes the FBI; correct?
10   A.  Correct.
11       MR. KHAZAELI:  No further questions.
12       MR. MILLIKAN:  Abby, do you have any?
13       MS. DUNCAN:  I have no follow-up.  Thanks.
14       MR. MILLIKAN:  Okay.  Bill, would you like to waive
15   or read?
16       THE WITNESS:  We can waive.
17       MR. MILLIKAN:  He'll waive.
18       THE VIDEOGRAPHER:  This concludes the video recorded
19   deposition of William Olsten at 11:39 a.m.  We are off
20   the record.
21           (Witness excused.)
22               * * * * *
23   (The deposition was concluded at 11:39 a.m.)
24   (Signature waived.)
25

Page 115

1              REPORTER'S CERTIFICATE
2
3        I, Lei Ann Laster Odom, Certified Realtime Reporter,
4    Registered Merit Reporter, Certified Court Reporter for the
5    State of Missouri, do hereby certify that the foregoing is a
6    true and correct transcription of my stenographic notes of the
7    testimony taken by me of the witness, WILLIAM OLSTEN, in the
8    matter of RASHEEN ALDRIDGE, Plaintiff, versus CITY OF SAINT
9    LOUIS, et. Al., Defendant, Case No. 4:18-cv-01677-CAS, said
10   deposition held at via Zoom on September 3, 2021, between 9:02
11   a.m. and 11:39 a.m., after said witness had been duly sworn by
12   me, that said testimony was taken down in Stenotype,
13   thereafter caused to be reduced to writing by means of
14   computer-aided transcription, and the signature of said
15   witness being waived.
16       WHEREOF, I have hereunto set my hand and affixed my seal
17   this 5th day of September, 2021.
18
19
20
21
22
23   Lei Ann Odom
     Certified Court Reporter No. 428
24   Certified Realtime Reporter
     Registered Merit Reporter
25

29 (Pages 113 to 115)