UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| RASHEEN ALDRIDGE, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| v. | ) | Case No.  4:18-cv-01677-SRC |
| | ) | |
| CITY OF ST. LOUIS, et al., | ) | |
| | ) | |
| Defendant(s). | ) | |

### Memorandum and Order

National and local racial tensions over use of force by police officers frame the context of this case.  In the weeks following a September 2017 verdict absolving a white officer who shot a black suspect, protests roiled downtown St. Louis.  The events in this case occurred during a protest outside Busch Stadium, in the waning innings of a St. Louis Cardinals game.  Amidst crowds exiting the ballgame and as protesters closed in on him, Officer William Olsten delivered a four-to-five second burst of pepper spray at numerous advancing protesters, including Plaintiff Rasheen Aldridge.  Aldridge brought section 1983 and state-law claims against Officer Olsten and others, alleging they violated his rights through the excessive use of force.  The Court addresses Defendants' various motions for summary judgment.  Docs. 117, 120.

### I.    Facts and background

On September 15, 2017, a state judge in the City of St. Louis issued a ruling in the criminal case against former police officer Jason Stockley, finding him not guilty of first-degree murder and armed criminal action.  Doc. 37-1.  Following the ruling, many people gathered in downtown St. Louis to protest the verdict, and the protests continued for more than a month.  Doc. 139 at pp. 1–2.

Aldridge, now a Missouri state representative, joined a protest near Busch Stadium on the evening of September 29, 2017.  Aldridge alleges that during the protest St. Louis Metropolitan Police Department (SLMPD) Officer William Olsten violated his civil rights.  Here, the Court addresses the claims in Aldridge's second amended complaint, Doc. 37, that he brings under 42 U.S.C. § 1983 for deprivation of his civil rights, failure to intervene, and failure to train or supervise.  He also brings several state-law claims.

In accord with the Court's local rules, Defendant Olsten submitted a Statement of Uncontroverted Material Facts, Doc. 119, as did Defendants Hayden and City of St. Louis, Doc. 121.  Aldridge responded by filing Docs. 133 and 135, respectively, adding separate Statements of Additional Uncontroverted Material Facts to each.  Defendants replied.  Docs. 139, 144.  The parties hotly contest a number of facts and make various objections.  The parties also submitted several videos of the incident but disagree about how to characterize certain portions of the videos.

The Court addresses these issues below, explaining where necessary the parties' debates about whether various factual assertions are controverted; the Court then explains for purposes of these motions why the Court finds various facts uncontroverted, controverted in part, or controverted.  When addressing the parties' arguments back and forth about the facts, for simplicity the Court often cites to Defendants' replies, Docs. 139 and 144, which set forth Defendants' asserted facts, Aldridge's responses, and Defendants' replies.

A.    The *Stockley* verdict

On September 15, 2017, a judge issued the verdict in the criminal bench trial of *State of Missouri v. Jason Stockle*y, acquitting white police officer Stockley of charges stemming from the death of a black man, Anthony Lamar Smith.  Doc. 139 at p. 1.  While the parties only

2

obliquely address the issue in their statements of fact, the Court takes judicial notice of the

respective races of Stockley and Smith, as adjudicative facts "generally known within the trial

court's territorial jurisdiction . . . ." Fed. R. Evid. 201; *see also* Doc. 37 at p. 3 (alleging that

"[t]o many in the St. Louis community, Officer Stockley's acquittal was yet another example of

white St. Louis-area police officers killing African-American citizens with impunity"). The

State had charged Officer Stockley with first-degree murder and armed criminal action for the

shooting death of Smith after a high-speed pursuit through city streets. Doc. 37-1 at p. 1. An

audio recording from inside the police car during the pursuit contained a mostly unintelligible

statement by Officer Stockley, but included the intelligible phrase "we're killing this

motherf\*cker, don't you know." *Id.* at p. 5. At trial, the State made much of the fact that Officer

Stockley possessed an "AK-47 pistol" at the time, in violation of department policy—though he

did not fire the weapon during the incident. *Id.* at p. 23. The State also claimed that he planted a

revolver found in Smith's car. *Id.* at p. 20. The judge, after "agonizingly" reviewing the

evidence "again and again," found Officer Stockley not guilty because he concluded that the

State had not proven every element of the charged offenses beyond a reasonable doubt. *Id.* at pp.

28–29.

    **B.**    **The *Stockley* protests**

    In response to the not-guilty verdict, protests began in downtown St. Louis that same day

and continued for more than a month. Doc. 139 at pp. 1–2, 4–5. Aldridge acknowledges that

protests began on the day of the *Stockley* verdict and continued for more than a month, but

argues that those protests are "irrelevant to the September 29, 2017 incident that is the subject of

this case." Doc. 135 at p. 1. Aldridge's argument that these, and other uncontroverted facts are

"irrelevant," without further elaboration, lacks merit. Evidence is relevant if it tends to make a

fact of consequence more or less probable, and only relevant evidence is admissible.  Fed. R. Evid. 401, 402.

Thus, the nature of the earlier *Stockley* protests informed the perspective of officers, like Olsten, Doc. 119-6 at p. 13, who were on duty during both the earlier protests and the protest on September 29.  Aldridge does not suggest, nor would the Court find reasonable, that the SLMPD officers on duty during the highly public *Stockley* protests would be unaware of the nature of the protests.  *See, e.g.*, *Murchison v. Rogers*, 779 F.3d 882, 887 (8th Cir. 2015) (reviewing grant of summary judgment *de novo* and "giving the non-moving party the benefit of all *reasonable* inferences" (citation omitted) (emphasis added)).

The parties requested that the Court take judicial notice of the briefing and filings in several related cases that provide additional context regarding the *Stockley* protests.  Doc. 136 at p. 5 n.1; Doc. 140 at p. 4 n.1; *see, e.g.*, *Panera, LLC v. Dobson*, 999 F.3d 1154, 1160 n.1 (8th Cir. 2021) ("Both parties have moved for us to take judicial notice of the Delaware court proceedings. We grant the parties' motions." (citation omitted)).  The Court takes judicial notice that the *Stockley* protests "concern[ed] not only the verdict itself but broader issues, including racism and the use of force by police officers," and that "[t]he participants often express[ed] views critical of police."  *Ahmad v. City of St. Louis, Mo.*, No. 17-cv-2455, 2017 WL 5478410, at *1 (E.D. Mo. Nov. 15, 2017); *see also, e.g.*, Doc. 37-4 at p. 6 (testimony that the plaintiff in *Ahmad* went downtown on September 15, 2017, to protest the *Stockley* verdict "[s]o that the system stops murdering black people with impunity");  Aff. of Megan Green at ¶ 3, *Ahmad v. City of St. Louis, Mo.*, No. 17-cv-2455 (E.D. Mo. Sep. 28, 2017) ("On the evening of Friday, September 15, 2017, I participated in the march . . . to express my disapproval of the acquittal of Officer Stockley, police brutality, and institutional racism.");  *Newbold v. City of St. Louis, Mo.*,

No. 18-cv-1572, 2019 WL 3220405, at *1 (E.D. Mo. July 16, 2019) (stating that "[t]he protests concerned not only the [*Stockley*] verdict but broader issues, including racism and the use of force by police officers").

Aldridge's recurring, unsupported assertion that "the protest [sic] that occurred on September 29, 2017, were not of the same character as the protests of the weekend of September 15, 2017," Doc. 135 at p. 2, also lacks merit.  *See* Fed. R. Civ. P. 56(e).  As discussed below, the Court must carefully consider the particular circumstances the officers faced on September 29, 2017, *Graham v. Connor*, 490 U.S. 386, 396 (1989), and those circumstances include the fact that while some form of protesting took place nearly every day following the *Stockley* verdict, tensions increased the most on September 15, September 17,  and September 29, 2017, the latter being the date of the events in this case.  Doc. 139 at pp. 5–6; *see White v. Pauly*, 137 S. Ct. 548, 550 (2017); *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).  At various times on those dates, the protests grew violent in nature, requiring a more significant police response.  Doc. 139 at pp. 6–7.

On September 15, 2017, the protests centered on the downtown area, and at one point moved to the area around Clark and Tucker, a few blocks west of Busch Stadium.  Doc. 139 at p. 2.  SLMPD brought multiple busses to this location to take officers away, hoping that moving the officers out of the area would prevent the protest from escalating.  *Id.*  However, after the officers boarded, protesters surrounded the busses, preventing them from leaving.  *Id.* at p. 3.  Protesters also threw objects at the busses, breaking one of the bus windows.  *Id.* at pp. 3–4.  Aldridge's arguments that Defendants fail to properly establish this last fact lack merit.  Aldridge argues that "Defendants have offered no evidence to corroborate this allegation" and that "the police report . . . makes no reference to a window being broken . . . ."  Doc. 139 at p. 3.  But

Defendants met the requirement of Rule 56(c) by "citing to particular parts of materials in the record"—here, a deposition of Officer Schaffer, who arrested a person for breaking the bus window—to establish this fact, and the Court finds it uncontroverted. *See* Doc. 139 at p. 3.

On September 17, 2017, following a peaceful march, several protesters ran downtown and caused significant property damage. Doc. 139. at p. 4. And on both September 15 and 17, individuals among the protesters initiated violent clashes with police—spraying chemicals and throwing objects, including broken pieces of concrete, at police officers. Doc. 139 at pp. 4, 7. These violent incidents resulted in injuries to a number of police officers, some of whom remained unable to return to full duty as of February 2020 due to the severity of their injuries. Doc. 133 at p. 2; Doc. 119-4 at pp. 31–32. As discussed below, Aldridge disputes whether protesters likewise initiated the violence on September 29, 2017, but does not dispute the characterization of the earlier protests. *See* Doc. 135 at p. 6; Doc. 139 at p. 7.

## C.    September 29 protest near Busch Stadium

Another of the ongoing *Stockley* protests took place in and around Busch Stadium on September 29, 2017, during a St. Louis Cardinals baseball game. Doc. 139 at p. 5; Doc. 133 at p. 2; Doc. 144 at p. 2. During the game, which began around 7:00 p.m., protesters unfurled a large banner in the stadium that read: "Stop Killing Us." Doc. 37 at p. 9; Doc. 119-2 at p. 9. Protesters also marched up and down various downtown streets for several hours protesting police violence, as police officers—including Olsten and other officers from his unit—blocked intersections and regulated pedestrian and vehicle traffic to allow protesters to march in the street. Doc. 139 at p. 7; Doc. 144 at p. 2. Around 9:00 p.m., a large group of protesters marching south on Broadway arrived at the intersection of Broadway and Walnut, less than two blocks from Busch Stadium. Doc. 133 at p. 3; Doc. 119-4 at p. 43. As the line of marchers

began to thin around 9:30 p.m., officers stopped the remaining marchers to allow some of the backed-up traffic to flow through the intersection.  Doc. 139 at pp. 7–8; Doc. 119-11 at p. 3; Olsten Exh. G (Real Time Crime Center (RTCC) video).  An altercation then occurred between multiple officers and at least two protesters, in which an officer deployed a taser.  Doc. 139 at pp. 7–8.  Officers arrested both protesters.  *Id.*; Doc. 144 at pp. 12–14.

Based on the affidavit of one of the arrested protesters, Reverend Gray, Aldridge claims that police initiated the altercation.  *See, e.g.*, Doc. 139 at p. 7.  Defendants respond by pointing to the fact that Reverend Gray was convicted for a municipal violation for interfering with officers directing traffic at the intersection.  Doc. 139 at p. 7; Doc. 139-1.  The Court finds that for purposes of this motion it is not material who started the altercation.

Aldridge's claims turn on what happened in the few minutes following the tasing-and-arrest incident, and the parties introduced three short videos of that time period.  *See* Olsten Exh. F (Maverick video, approx. two minutes); Olsten Exh. G (RTCC video, approx. five minutes); Olsten Exh. H (De Mian video, approx. three minutes).  As explained throughout this section, the parties disagree at times about what the videos show, but do not dispute that all three videos depict the September 29 protest near Busch Stadium that occurred near the end of the baseball game, as some fans were exiting the nearby stadium.

Officer Olsten was not involved in the arrests or the tasing, but he did help escort one of the arrestees away from the scene.  Doc. 139 at p. 8.  Aldridge was among numerous protesters marching south on Broadway away from the intersection of Broadway and Walnut who abruptly turned north and hurried back to the area near the intersection.  Doc. 133 at p. 5; Doc. 139 at p. 9; Olsten Exh. H (De Mian video) 00:00–00:20.  Citing only the Maverick video, Aldridge objects to Defendants' use of the word "numerous" as "misleading and inaccurate" when used to

describe the number of protesters who began returning to the area, claiming rather that "a handful of citizens returned to the intersection." Doc. 133 at p. 5. Regardless of how many protesters are shown in the one video Aldridge selectively cites, Aldridge fails to controvert that the other two videos show many protesters returning to the intersection. *See* Olsten Exh. G (RTCC video) 01:06–01:30; Olsten Exh. H (De Mian video) 00:15–01:15. The videos show at least fifty individuals pressing in on the officers during this time. *Id.*

In response to the arrests and tasing, many people began to loudly question police actions. Doc. 144 at p. 12; Olsten Exh. F (Maverick video) 00:00–00:42; Olsten Exh. H (De Mian video) 00:15–01:30. Aldridge asserts that these individuals were responding to "SLMPD's unwarranted escalation" and were questioning "why the police had decided to use violence when it was clearly unwarranted." Doc. 144 at p. 12. Olsten objects that this characterization of the video is argumentative, and the Court agrees. *Id.* The parties do not dispute that many individuals began to loudly question police actions.

Amir Brandy, one of these protesters, shouted repeatedly at Officer Olsten—who was holding a fog canister of pepper spray in his hand—statements including: "I'm going to f*ck you up"; "You put that sh*t in my face, I'm going to f*ck you up"; "I ain't scared of your mother f*cking ass"; "Put that sh*t in my face"; and "Pu*sy-ass white boy." Doc. 133 at p. 10; Doc. 139 at pp. 9–10; Olsten Exh. F (Maverick video) 01:25-01:55.

Aldridge does not dispute that Brandy made these statements, but does dispute Defendants' characterization of the statements as "threats" and "challenges." Doc. 139 at pp. 9–10. Aldridge bases his argument on Brandy's post hoc characterization that he "was not threatening anyone," and Aldridge's expert, who opined both that the protesters "were not posing a threat when Officer Olsten sprayed them" and that Olsten showed agitation, not fear. Doc. 139

at pp. 9–10; Doc. 133 at p. 10.  Aldridge also urges that Brandy's complete statement implies "(if you) put that sh*t in my face, I'm going to f*ck you up." Doc. 139 at p. 9; Doc. 133 at p. 10. Aldridge's interpretation is that "Brandy is stating that only if Olsten doused him with pepper spray (for no reason), Brandy might react," and argues that "[g]iven the number of officers around, it was a meaningless statement in reaction to his friend getting brutally and unjustifiably assaulted." Doc. 133 at p. 10.

The Court finds that Brandy's statements were threats in the sense that they "express[ed] an intention to inflict evil, injury, or damage on another, usually as retribution or punishment for something done." *Threat*, *Webster's Third New International Dictionary* (2002).  But ultimately whether Brandy actually intended the statements as threats is not material.  Instead, the Court must determine whether—viewed objectively in light of the particular facts and circumstances— a  reasonable officer in Aldridge's position would have interpreted Brandy's shouts as threats. *See Graham*, 490 U.S. at 396.

Officers issued at least eight commands to the group of protesters, including Aldridge, exhorting them to "get back" or "back up" while the officers escorted the arrested individual toward a secure location on Walnut.  Doc. 133 at pp. 6, 9.  The growing number of protesters, at least some of whom were audibly and visibly angry over the arrests and began yelling and screaming at the officers, disregarded the officers' commands to "get back" and continued to converge on the area, closing in on the officers escorting the arrestee.  Doc. 133 at p. 11; Doc. 139 at p. 11.

While walking backwards, escorting the arrested protester back toward the intersection, Officer Olsten responded to one of Brandy's shouts of "I'm going to f*ck you up" by taking a step back toward the protesters and saying "come and f*ck me up then."  Doc. 139 at pp. 29–30;

Olsten Exh. F (Maverick video) 01:26–01:30.  The officer next to Olsten put a hand on Olsten's arm, another reached out toward Olsten's shoulder, and then the officers continued toward the intersection.  Olsten Exh. F (Maverick video) 01:26–01:30.  Then, as the officers escorting the arrested protester entered the intersection and Brandy visibly disregarded another command from an officer to "get back," Officer Olsten gestured with his pepper spray canister and said: "keep coming."  *Id.* at 01:30–01:40.

Aldridge attempts to controvert this fact, arguing based only on the Maverick video that protesters stopped moving before Olsten deployed pepper spray.  Doc. 133 at p. 11.  The Court finds that Aldridge does not controvert the fact, and that he mischaracterizes the situation depicted in the videos.  First, the Court notes that "stopping moving" is not the same as "backing up."  Second, while the portion of the one video Aldridge selectively relies on may show some protesters stopping in the intersection near Olsten, Aldridge does not controvert Defendants' other videos, and testimony, establishing that other protesters were continuing to converge on the officers.  The videos show at least forty individuals near the intersection when Olsten handed off the arrestee to other officers and turned and took up a position in the intersection, moving back a few steps toward the protesters coming up from south Broadway.

At this point, as protesters continued to converge on the officers, Olsten was only a few feet away from Brandy, who was continuing to yell at Olsten.  Doc. 133 at p. 12; Doc. 139 at p. 13.  Olsten then stated "dude, back up."  Doc. 133 at p. 11; Olsten Exh. F (Maverick video) 01:45.  Aldridge argues that based on the video alone, it is unclear if Olsten is the one who says "back up," as the camera pans left away from Olsten when the statement is made.  Doc. 133 at p. 11; *see* Olsten Exh. F (Maverick video) 01:45.  But Defendants do not rely on the video alone, they also point to Officer Bartlett's testimony at Officer Olsten's criminal trial that before

10

deploying his pepper spray, Olsten "told the subject to get back."  Doc. 133 at p. 11; Doc. 119-2 at p. 23.  The Court also notes that the judgment in Olsten's criminal case found that "[a]fter directing the crowd to get back, [Olsten] administered his pepper spray . . . ."  Doc. 119-11 at p. 4; *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").  Aldridge thus fails to support his assertion that the fact is genuinely disputed.  *See* Fed. R. Civ. P. 56(c)(1).

Then, the event precipitating Olsten's use of pepper spray occurred.  Among other angry shouts from protesters, a female protester shouted something that the parties variously interpret as "shut this motherf*cker down" or "shoot these motherf*ckers back."  Doc. 133 at p. 13; Doc. 139 at p. 12.  Olsten deployed a four- or five-second burst of pepper spray immediately upon hearing the female protester's shout.  Doc. 133 at p. 13; Doc. 139 at pp. 12–13; Olsten Exh. F (Maverick video) 01:55; Olsten Exh. H (De Mian video) 01:30.  The parties dispute the duration of the burst of pepper spray, claiming it lasted four or five seconds, respectively, but the Court finds the one second difference immaterial.  It is uncontroverted that Aldridge was standing next to Brandy shortly before Olsten deployed his pepper spray, and that the pepper spray hit Aldridge.  Doc. 133 at p. 10–11; Doc. 139 at p. 13; Doc. 144 at p. 22.  (In their memorandum in support, Defendants assert that Aldridge was "standing next to Mr. Brandy the entire time that he was shouting his threats."  Doc. 122 at p. 5 (citing Doc. 121 at ¶ 33).  But in paragraph 33, Defendants do not state that Aldridge was standing there "the entire time."  Doc. 121 at ¶ 33.  The Court finds this discrepancy inconsequential.)

Commissioner Hayden, then a Major, was present at the scene.  Doc. 139 at p. 49; Doc. 144 at p. 2.  Hayden testified about the close proximity of the protests to the crowd leaving the baseball game.  Doc. 119-4 at p. 39.  As noted in the criminal judgment finding Olsten not guilty,

following the baseball game, "people with small children are visible in the video walking away from the stadium, then along the Broadway sidewalk." Doc. 119-11 at p. 5; *see* Olsten Exh. F (Maverick video); Olsten Exh. G (RTCC video); Olsten Exh. H (De Mian video).

Aldridge asserts that "Hayden testified that he did not pull out his mace because he was not afraid for his safety," and thus Aldridge and Brandy must not have been a threat to the officers. Doc. 134 at p. 13. But this misconstrues Hayden's testimony. In his deposition in Olsten's criminal case, Hayden confirmed that he did not pull out his mace, and stated that "it's reasonable—if a person is concerned about their safety, it's reasonable for them to pull out mace." Doc. 119-3 at p. 11. But Hayden also testified that right before Olsten deployed his mace, Hayden was on his radio asking for additional assistance because he believed the situation would be a "very hot flashpoint" for violence. Doc. 139 at pp. 17–18; Doc. 119-3 at pp. 11–12. The Maverick and De Mian videos reinforce this—Hayden visibly holds his hand-held radio up near his mouth less than ten seconds before Olsten used his pepper spray. Olsten Exh. F (Maverick video) 01:45–01:48; Olsten Exh. H (De Mian video) 01:15–01:30. And Hayden testified that at that point he was "very concerned about officer safety" due to what he characterized as a "hostile" and "fairly chaotic" situation that was "becoming combative" as officers interacted with belligerent protesters. Doc. 119-4 at p. 50. Commissioner Hayden does not recall much after that because of the volatility of the situation. Doc. 139 at p. 18.

While in his complaint Aldridge alleges various injuries from the pepper spray, Doc. 37 at p. 11, for purposes of summary judgment he does not attempt to establish any facts regarding whether he suffered any physical injuries. Aldridge also alleges that the Defendants interfered with his protesting, Doc. 37 at p. 16, but on summary judgment he does not attempt to establish facts regarding the nature or extent of any alleged interference with his protesting activities.

### D.      State court acquits Officer Olsten of any criminal charges

In July 2019 the St. Louis City Circuit Attorney's Office filed a complaint against Olsten

in *State v. Olsten*, No. 1922-CR02199 (22nd Jud. Cir.), alleging he assaulted Aldridge and other

individuals by spraying them with pepper spray on September 29, 2017.  Doc. 119-11.  The

alleged conduct arose out of the same allegations contained in Aldridge's Second Amended

Complaint.  *Id.*  On May 28, 2021, the court in that criminal case entered its Judgment finding

Olsten not guilty on all counts, acquitting Olsten of all charges alleged in connection with his

conduct.  *Id.* at p. 15.

### II.    Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  In ruling on a motion for summary

judgment, the Court is required to view the evidence in the light most favorable to the non-

moving party and must give that party the benefit of all reasonable inferences to be drawn from

the underlying facts.  *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987).  The

moving party bears the initial burden of showing both the absence of a genuine issue of material

fact and entitlement to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 250 (1986); Fed. R. Civ. P. 56(a).

In response to the proponent's showing, the opponent's burden is to "come forward with

'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v.

Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  Self-serving,

conclusory statements without support are insufficient to defeat summary judgment.  *Armour &

Co. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993).  Rule 56(c) "mandates the entry of

summary judgment, after adequate time for discovery and upon motion, against a party who fails

13

to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986).

## III.   Analysis

Aldridge's eight-count complaint asserts claims against the City of St. Louis, Officer

Olsten, and Commissioner Hayden.  In Count 1, brought under 42 U.S.C. § 1983, Aldridge

alleges that Defendants Olsten and Hayden violated his First- and Fourteenth-Amendment rights.

In Count 2, also brought under § 1983, Aldridge alleges a *Monell* municipal-liability claim

against the City.  Aldridge also brings Missouri state-law claims against all Defendants.  In

Count 6, Aldridge brings a Fourth- and Fourteenth-Amendment excessive-force claim against

Defendant Olsten under § 1983.  In Count 7, Aldridge brings a Fourth- and Fourteenth-

Amendment failure-to-intervene claim against Defendant Hayden under § 1983.

Defendants moved for summary judgement on all Counts.  Docs. 117, 120.  Defendant

Olsten argues that he is entitled to qualified immunity from Aldridge's federal-law claims

(Counts 1 and 6) and to official immunity from Aldridge's state-law claims (Counts 3, 4, 5, and

8).  The City argues that Officer Olsten did not violate Aldridge's constitutional rights, so the

City cannot be liable under § 1983 or *Monell* (Count 2).  Alternatively, the City argues that even

if Officer Olsten did violate Aldridge's constitutional rights, Aldridge fails to present evidence to

support his *Monell* claim against the City (Count 2).  Defendants further argue that

Commissioner Hayden is entitled to qualified immunity from Aldridge's failure-to-intervene

claim (Count 7), and that Aldridge failed to allege that Commissioner Hayden was personally

involved in any First-Amendment retaliation (Count 1).  Defendants also argue that the City is

entitled to sovereign immunity, and that Commissioner Hayden is entitled to official immunity, from any state-law claims (Counts 3, 4, 5, and 8).

Officer Olsten also filed a crossclaim against the City of St. Louis, alleging that the City owes him reimbursement of accrued attorney's fees and expenses, as well as future representation and indemnification.  Doc. 54.

### A.    Qualified immunity

The Court first considers Defendant Olsten's qualified-immunity defense.  Section 1983 of Title 42 allows individuals to sue for violations of the U.S. Constitution.  The section in relevant part states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983.  "Qualified immunity shields a government official from suit under § 1983 if his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Kelsay v. Ernst*, 933 F.3d 975, 979 (8th Cir. 2019) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  When a defendant invokes qualified immunity, the burden falls on the plaintiff to show: "(1) the facts, viewed in the light most favorable to the plaintiff[], demonstrate the deprivation of a constitutional right; and (2) the right was clearly established at the time of the deprivation."  *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1155 (8th Cir. 2014) (quoting *Baribeau v. City of Minneapolis*, 596 F.3d 465, 474 (8th Cir. 2010)).  Thus, to determine whether a defendant is qualifiedly immune, the Court considers whether the alleged facts demonstrate that his conduct violated a constitutional right and, if so, whether the right claimed was clearly established at the time of the alleged injury.

*Howard v. Kansas City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009).  "If the answer to either question is no," then the defendant is qualifiedly immune.  *Doe v. Flaherty*, 623 F.3d 577, 583 (8th Cir. 2010).

Officer Olsten argues that qualified immunity shields him from all of Aldridge's federal § 1983 claims, including Aldridge's Fourth-Amendment excessive-force claim (Count 6) and First-Amendment retaliation claim (Count 1).  Commissioner Hayden also argues that qualified immunity shields him from both federal § 1983 claims.

### 1.    Fourth Amendment—excessive force

The Court first examines Olsten's qualified-immunity defense regarding Aldridge's § 1983 excessive-force claim.  "[C]laim[s] of excessive force [are] governed by the Fourth Amendment's prohibition against unreasonable seizures."  *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012) (citing *Graham*, 490 U.S. at 395).  "[T]he question whether an officer has used excessive force requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).  "'The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' And '[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'"  *Id.* (quoting *Graham*, 490 U.S. at 396).

In other words, courts do not sit in second-guessing judgment of moment-to-moment police conduct but review the conduct for objective reasonableness in view of the facts as a whole, "without regard to [the officers'] underlying intent or motivation." *Graham*, 490 U.S. at 396; *see also id.* at 397 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." (internal citations omitted)). "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.* at 397 (citations omitted).

### a.  Known vs. knowable

In *Kingsley v. Hendrickson*, the Supreme Court identified a non-exclusive list of factors that "illustrate the types of objective circumstances potentially relevant to a determination of excessive force," including:  "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397 (citing *Graham*, 490 U.S. at 396); *see also Zubrod v. Hoch*, 907 F.3d 568, 577 (8th Cir. 2018) (applying the *Kingsley* factors to an excessive-force-by-police claim).

In *White v. Pauly*, the Supreme Court applied this objective standard to a section 1983 action involving alleged excessive use of force by a law enforcement officer.  *White*, 137 S. Ct. at 550.  In so doing, the Court stated that "[b]ecause this case concerns the defense of qualified immunity . . . the Court considers only the facts that were *knowable* to the defendant officers." *Id.* (citing *Kingsley*, 576 U.S. at  397).  The *White* Court, however, did not define the term "knowable."  This case raises some questions about what "knowable" means in the context of a

section 1983 excessive-use-of-force case.  It could mean the officer's actual knowledge, or knowledge that a reasonable officer in the position of the officer in question could have known at the time in question, or something else.  *See*, *e.g.*,  *Knowable*, *Webster's Third New International Dictionary* (2002) (defining "knowable" as "capable of being known").  The Court therefore explores the origins of the "knowable" concept and examines how the Supreme Court and the Eighth Circuit have applied it in various situations.

In *White* itself, the Court held that "[c]learly established federal law does not prohibit a reasonable officer who arrives late to an ongoing police action in circumstances like this from assuming that proper procedures, such as officer identification, have already been followed." 137 S. Ct. at 552.  And, in *Kingsley*, where the Court "adopt[ed] an objective standard for pretrial detainees' excessive force claims," and from which the *White* Court divined the "knowable" standard, the Court did not apply the objective standard to the facts, but instead held that a jury instruction including the word "reckless" was subjective rather than objective.  576 U.S. at 399, 402–03.  In *Hernandez v. Mesa*, the Court quoted *White* for the proposition that "[t]he qualified immunity analysis thus is limited to 'the facts that were knowable to the defendant officers' at the time they engaged in the conduct in question," but remanded without applying that rule to the facts.  137 S. Ct. 2003, 2007 (2017).  The Court did add that "[f]acts an officer learns after the incident ends—whether those facts would support granting immunity or denying it—are not relevant."  *Id.*

In *N.S. v. Kansas City Bd. of Police Commissioners*, an excessive-force case, while the Eighth Circuit did not use the term "knowable," it did cite *Hernandez* when instructing that district "court[s] should begin [the qualified immunity analysis] by specifically identifying the plaintiff-friendly version of the disputed facts . . . [and] must then evaluate whether [the officer],

*in light of all the information available to him at the moment*, violated clearly established law . . . ."  933 F.3d 967, 970 (8th Cir. 2019) (citing *Kisela*, 138 S. Ct. at 1153–53; *Hernandez*, 137 S. Ct. at 2007)) (emphasis added).  The court also identified that the district court in that case had erroneously suggested that the suspect's subjective belief was relevant—the court noted that "[e]ven assuming that this is a provable fact, it is completely irrelevant to the qualified-immunity analysis, which considers only the facts *actually available to the officer at the time*."  *Id.* at 970 n.1 (citing *Hernandez*, 137 S. Ct. at 2007) (emphasis added).  The court's phrasing of the inquiry as facts or information "available to the officer at the time" suggests something other than the officer's actual knowledge at the time, i.e. something more akin to what the officer *could have known* at the time.

About a year later, in *Boudoin v. Harsson*, the Eighth Circuit used the term "knowable," citing *White*, and found that Harsson, the defendant officer, "could reasonably conclude" that Boudoin was attempting to flee arrest on a motorcycle "based on the information provided to [Harsson] by other officers and the undisputed actions he observed."  962 F.3d 1034, 1040 (8th Cir. 2020).  In making this determination the Court relied on the following undisputed facts:  (1) the defendant officer "*knew* multiple officers had attempted to stop a white male riding a black motorcycle with no license plate for speeding and that the suspect had evaded arrest multiple times by fleeing at a high rate of speed"; (2) "Harsson *spotted* Boudoin . . . driving at a high rate of speed"; (3) "Harsson  . . . *personally observed* Boudoin engage in actions that could reasonably be interpreted as an attempt to flee"; (4) "Boudoin admitted that he did not immediately pull to the shoulder of the highway but instead tried to get in front of Harsson when Harsson attempted to stop him"; and (5) Rather than deploy his kickstand, "Boudoin shift[ed] his

weight, moving his left leg in an 'up and down motion,' and 'clicking' the gear shifter." *Id.* at 1041 (emphasis added).

The *Boudoin* court also concluded that "there can be little doubt but that a reasonable officer could conclude that fleeing from four other officers at speeds exceeding 100 miles per hour in evening traffic demonstrates an extreme indifference to the value of human life" and that "because Harsson believed Boudoin had fled from no fewer than four other officers, traveling at speeds exceeding 100 miles per hour in evening traffic, he could reasonably conclude that Boudoin posed an "immediate threat to the safety of the officers [and] others." *Id.* at 1041–42 (citations omitted).  In sum, the situation in *Boudoin* didn't necessitate a distinction between "known" and "knowable" facts.

From this limited number of cases applying or reciting the term "knowable," it is unclear whether the Supreme Court intended to simply rephrase the objective-reasonableness inquiry (for comparison, the Court previously stated in *Graham* that "the question is whether the officers' actions are 'objectively reasonable' *in light of the facts and circumstances confronting them*," 490 U.S. at 397 (emphasis added)), or expand it to encapsulate, for example, what an officer on the scene "could have known."

Here, if the latter were true, then the Court would consider additional facts in the record, such as Hayden's call for backup, as relevant to the objective-reasonableness analysis.  Though Olsten does not claim that he heard or was aware of Hayden's calling for backup just before he employed the pepper spray, based on the proximity of Olsten to Hayden, as seen in the videos, it is certainly possible that Olsten heard, or could have heard, Hayden call for backup on the radio. *See* Olsten Exh. H (De Mian video) 01:15-01:30; Olsten Exh. F (Maverick video) 01:45-01:50. However, because of the loud and chaotic nature of the scene, it is also possible that Olsten did

not hear, or could not have heard, Hayden.  Thus if "knowable" means "could have known," or something similar, then the Court could include the call for backup in the objective-reasonableness analysis, which would only further strengthen the Court's conclusion, explained below, that Olsten's actions were objectively reasonable.

However, the Court would reach the same conclusion with or without including Hayden's call for backup.  And for purposes of this order, viewing the facts in the light most favorable to Aldridge, the Court does not consider Hayden's call for backup as a fact that Olsten in fact knew at the time.  *See Kingsley*, 576 U.S. at 397.

The Court has also carefully considered the recent Eighth Circuit decisions in *Mitchell v. Kirchmeier*, No. 21-1071, 2022 WL 759938 (8th Cir. Mar. 14, 2022), and *Baude v. Leyshock*, 23 F.4th 1065 (8th Cir. 2022).  In both cases, the Eighth Circuit highlighted the difference between considering allegations in support of excessive-force claims at the motion-to-dismiss stage and considering what the record showed at the summary-judgment stage.

In *Mitchell*, the Eighth Circuit held that the district court erred in granting defendants' motion to dismiss a Fourth-Amendment excessive-force claim against officers who allegedly shot the plaintiff in the face with "shotgun-propelled, lead-filled bean bags," shattering his eye socket.  *Mitchell*, 2022 WL 759938, at *6.  The court distinguished *Mitchell* from *Bernini v. City of St. Paul*, 665 F.3d 997 (8th Cir. 2012), pointing out that it affirmed summary judgment in *Bernini* for defendant police officers, based on qualified immunity, after "discovery revealed that the officers used force because 'a large and potentially riotous group' was advancing against a police barricade 'in a threatening manner' despite repeated warnings to 'back up[.]'"  *Id.* (citing *Bernini*, 665 F.3d at 1001–04, 1006–07).  The court concluded that at the motion-to-dismiss stage, the plaintiff's allegations in *Mitchell* were "sufficient to state a claim for excessive force"

21

and that the officers were not entitled to qualified immunity "unless and until discovery tells a different story." *Id.*

The Eighth Circuit similarly distinguished *Baude*, on appeal from the denial of a motion to dismiss based on qualified immunity, from two cases decided at the summary-judgment stage: *Bernini*, 665 F.3d 997, and *Burbridge v. City of St. Louis*, 430 F. Supp. 3d 595 (E.D. Mo. 2019), *aff'd*, 2 F.4th 774 (8th Cir. 2021).  *Baude*, 23 F.4th at 1072.  Here, as in *Bernini* and *Burbridge*, and unlike in *Mitchell* and *Baude*, the parties have developed the factual record—including by providing videos of the pepper-spraying incident at the center of the case—and  Defendants have moved for summary judgment.

### b.  Application of the "known" standard

Aldridge contends that Officer Olsten violated the Fourth Amendment by using excessive force.  But objectively viewing the totality of the circumstances from the perspective of a reasonable officer on the scene, "in light of the facts and circumstances confronting him," *Loch*, 689 F.3d at 965 (citation omitted)—and without the benefit of 20/20 hindsight, *Graham*, 490 U.S. at 396—the Court concludes that Olsten's use of pepper spray was reasonable, and thus he is entitled to qualified immunity.

Protests erupted in St. Louis following the *Stockley* verdict, in which a state judge acquitted white police officer Stockley of all charges stemming from the shooting death of Smith, a black man.  The protests—which concerned not only the verdict, but broader issues of racism and police use of force—continued almost daily and turned violent on several occasions, requiring varying, and sometimes more significant, police responses.  Various officers on duty during these protests suffered injuries, including some severe enough to prevent officers from returning to full duty as late as February 2020, nearly two-and-a-half years later.

The specific events in question occurred during a protest two weeks after the *Stockley*

verdict.  The protest took place both inside and outside Busch Stadium during a Cardinals

baseball game.  Inside the stadium, protesters unfurled a banner during the game that read:  "Stop

Killing Us."  Nearby, outside of the stadium, during and near the end of the game, protesters

marched up and down several downtown streets.  Olsten and other officers helped regulate traffic

to allow the protesters to march in the street.

Around 9:00 p.m., a large group of protesters marching south on Broadway passed

through the intersection of Broadway and Walnut, less than two blocks from the stadium.  The

line of marchers began to thin around 9:30 p.m., as the baseball game was nearing completion

and some fans were exiting the stadium.

As officers stopped the remaining protesters so that backed-up traffic could flow through

the intersection, an altercation took place between officers and at least two protesters, which

resulted in officers arresting one protester near the intersection of Walnut and Broadway, and

then tasing and arresting another protester who ran south on Broadway away from the

intersection.  Officer Olsten, though not involved with the tasing or arrests, helped escort the

latter arrestee back toward the intersection.  Multiple officers, including Olsten, issued

commands to "get back" or "back up" at least eight times in the minute or so between the tasing

and arrest of the protester and Olsten's use of pepper spray.  During that time, the officers

retreated north toward the intersection and a secure location on Walnut.  The growing number of

protesters, including Aldridge—at least some of whom were audibly angry over the arrests and

began yelling and screaming at the officers—disobeyed the officers' commands to "get back"

and pursued the officers as the latter moved towards the intersection.  The exact number of

protesters is disputed, but the video evidence shows at least fifty individuals moving toward the

officers, and at least forty individuals near the intersection when Officer Olsten deployed his pepper spray.  Further, the arrests happened as the last of the large group of protesters the officers were observing and blocking traffic for passed the intersection.  And the baseball game with its tens of thousands of fans was nearing completion, with some fans already headed away from the stadium—including families with children.  *See Kingsley*, 576 U.S. at 397 (listing "the severity of the security problem at issue" as an example of an appropriate objective-reasonableness factor).

As the protesters followed the officers, one protester, Amir Brandy, repeatedly yelled statements at Officer Olsten—who was visibly holding a fog canister of pepper spray in his hand—that an officer in his position could have interpreted as threatening, including:  "I'm going to f*ck you up"; "You put that sh*t in my face, I'm going to f*ck you up"; "Put that sh*t in my face"; and "Pu*sy-ass white boy."  After handing off the arrestee to other officers at the corner of Broadway and Walnut, Officer Olsten turned and took up a position in the intersection, moving back toward the protesters coming up from south Broadway.  At this point he was several feet away from Brandy, who was continuing to yell at Olsten.  Olsten then stated "dude, back up." During this interaction Aldridge was standing immediately next to Brandy.

Then, among angry shouts from other protesters, a female protester shouted something that the parties variously interpret as "shut this motherf*cker down" or "shoot these motherf*ckers back."  Either way, it is uncontroverted that Olsten deployed his pepper spray immediately upon hearing the female protester's shout.  Olsten Exh. F (Maverick video) 01:55. The parties dispute whether Olsten initially targeted Brandy, but do not dispute that he did not only target Brandy—rather, he deployed his pepper spray against multiple protesters, including

Aldridge, Brandy and the female protester on Olsten's right who shouted what he reasonably perceived as a threat.

Further, though Aldridge himself did not issue any threats, it is undisputed that he was among the protesters who hurried back toward the intersection and the officers' position after the two arrests, and that he moved to the front of the crowd and walked next to Brandy while Brandy shouted at, and the protesters closed in on, Olsten.  It was reasonable for an officer in Olsten's position to perceive multiple threats from an approaching crowd, and to believe that Aldridge and Brandy were together—or that all the protesters ignoring commands to "get back" and shouting what the officers could reasonably perceive as threats were acting together.

The Court acknowledges several details regarding Officer Olsten's conduct.  First, while walking backwards, escorting the arrested protester back toward the intersection, Officer Olsten responded to one of Brandy's shouts of "I'm going to f*ck you up" by taking a step towards the protesters and saying "come and f*ck me up then."  The officer next to Olsten put a hand on Olsten's arm, another reached out toward Olsten's shoulder, and then officers continued toward the intersection.  Then, as the officers escorting the arrested protester entered the intersection, Brandy disregarded yet another officer's command to "get back," and Officer Olsten gestured with his pepper spray canister and said "keep coming."

These details, however, do not alter the constitutional analysis because the Court must view Olsten's conduct "without regard to [his] underlying intent or motivation." *Graham*, 490 U.S. at 396 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." (internal citations omitted)).  "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force

constitutional." *Id.* (citations omitted).  While these aspects of Olsten's conduct may not have been ideal, the totality of the circumstances does not show evil or retaliatory motive (a finding buttressed, albeit not disposed of, by the acquittal of Olsten on criminal charges); similarly, these acts by Olsten do not change the fact that the crowd of protesters—including Brandy and Aldridge—kept closing in on the retreating officers, repeatedly ignoring numerous commands to "get back," or that some of the protesters were shouting what an officer could reasonably interpret as threats.  *See id.*

The particular use of force that Officer Olsten deployed—here, a short burst of hand-held fog-canister pepper spray—also factors into the Court's analysis.  *Kingsley*, 576 U.S. at 397.  As a tool of non-deadly force "designed to be used as an alternative to physical contact (an intermediate option) between the officer and person(s) involved," Doc. 133-6 at p. 12, the pepper spray performed its function of diffusing (and perhaps de-fusing) a threatening situation, without causing any (or at best anything but de minimis) physical injuries.

The Court acknowledges that the Eighth Circuit has noted "[p]epper spray can cause more than temporary pain." *Tatum v. Robinson*, 858 F.3d 544, 550 (8th Cir. 2017).  *But see Jones v. City of Minneapolis*, 337 F. App'x 596, 597–99 (8th Cir. 2009) (per curiam) (affirming district court's dismissal of excessive force claims at summary judgment stage because plaintiffs—who "were exposed to mace and suffered eye and lung irritation"—only suffered de minimis injuries insufficient to support a Fourth-Amendment violation).

Aldridge himself does not allege any lasting physical injury, and for purposes of summary judgment does not attempt to prove any physical injury at all.  *See Kingsley*, 576 U.S. at 397 (listing "the extent of the plaintiff's injury" among objective-reasonableness factors); *Crumley v. City of St. Paul, Minn.*, 324 F.3d 1003, 1007 (8th Cir. 2003) ("In addition to the

circumstances surrounding the use of force, we may also consider the result of the force." (citations omitted)).  More specifically, while Aldridge makes the allegation in his complaint, Doc. 37 at p. 11, that "[t]he pepper spray worked as intended as Mr. Aldridge began to feel excruciating pain.  His eyes began to burn.  Mucus ran from his nose.  His breathing became labored," he does not address his alleged injuries in his responses to Defendants' statements of uncontroverted material facts, and does not attempt in his own statement of additional uncontroverted material facts to establish any such injuries.  Docs. 133, 135.  Thus, Aldridge chose to leave the summary-judgment record devoid of whether and to what extent he may have experienced any physical injuries.

Aldridge disputes whether Olsten felt threatened, and argues that accepting that fact as true is to "view it solely in the light most favorable to Officer Olsten."  Doc. 134 at p. 20.  But this argument misses the mark because the Court's duty is to review the conduct for objective reasonableness in view of the facts as a whole, "without regard to [the officers'] underlying intent or motivation."  *Graham*, 490 U.S. at 396.  Aldridge also argues that because Brandy testified that he did not intend his statements as threats, and because the parties dispute exactly what the female voice shouted right before Olsten deployed his pepper spray, the Court must leave those facts for a jury.  Doc. 139 at pp. 10, 12.  The Court acknowledges that a reasonable juror could conclude that the female protester shouted:  "Shut this motherf*cker down."  But this does not create a genuine dispute of material fact.  While it is possible that Brandy and the female protester's actions are "susceptible to an innocent explanation . . . a reasonable officer, based on the same facts, could have concluded otherwise."  *Boudoin v. Harsson*, 962 F.3d 1034, 1041 (8th Cir. 2020).  And having reviewed the videos and considered the totality of the circumstances, yet not applying 20/20 hindsight in the comfort of chambers, the Court finds that

a reasonable officer in Olsten's position at the time of the events in question could reasonably have interpreted the shout as a threat, regardless of whether the words were "shut this motherf*cker down" or "shoot these motherf*ckers back."  Doc. 133 at p. 13; Doc. 139 at p. 12; *see Kingsley*, 576 U.S. at 397 (listing "the threat reasonably perceived by the officer" as an objective-reasonableness factor).

Aldridge also points out that after Officer Olsten deployed the pepper spray to disperse the crowd, Brandy did not assault Olsten after all.  And it is certainly possible that had Olsten not deployed his pepper spray, the crowd of protesters would have "backed up" out of the intersection and the protest would have continued without devolving into a more dangerous situation.  But the law does not allow the Court to exercise this kind of hindsight, *Graham*, 490 U.S. at 396, and doing so here would violate the Supreme Court's directive in *Hernandez* that "facts an officer learns after the incident ends[,]" here the pepper-spray incident, "whether those facts would support granting immunity or denying it—are not relevant." 137 S. Ct. at 2007.  The Supreme Court's admonition in *Graham* bears repeating:  "With respect to a claim of excessive force, the same standard of reasonableness at the moment applies:  'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." 490 U.S. at 396–97 (internal citation omitted).  And the Court's "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.*

With these admonitions in mind, the Court must review the conduct for objective reasonableness in view of the facts as a whole.  *Id.* at 396.  Having done so, the Court concludes

that Officer Olsten's actions were not objectively unreasonable under the circumstances; he thus

did not violate Aldridge's constitutional rights, and he is entitled to qualified immunity.

### c.  Clearly established right

Even if the Court were to find that Officer Olsten violated Aldridge's constitutional rights

when he used pepper spray to disperse the advancing protesters, the Court finds that the right

was not clearly established at the time of the violation. Thus, even assuming a violation occurred,

"on these facts [Olsten] was at least entitled to qualified immunity." *See Kisela*, 138 S. Ct. at

1152.

The Supreme Court has "reiterat[ed] the longstanding principle that 'clearly established

law' should not be defined 'at a high level of generality.'" *White*, 137 S. Ct. at 552 (quoting

*Ashcroft v. al–Kidd*, 563 U.S. 731, 742 (2011)).  As the "Court explained decades ago, the

clearly established law must be 'particularized' to the facts of the case." *Id.* (citing *Anderson v.

Creighton*, 483 U.S. 635, 640 (1987)). "Otherwise, '[p]laintiffs would be able to convert the rule

of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation

of extremely abstract rights.'" *Id.* (citing *Anderson*, 483 U.S. at 639) (alteration in original).

Aldridge relies on the Eighth Circuit's statement that "[t]here is no requirement that the

plaintiff must find a case where the very action in question has previously been held unlawful so

long as existing precedent has placed the statutory or constitutional question beyond debate."

*MacKintrush v. Pulaski Cty. Sheriff's Dep't*, 987 F.3d 767, 770 (8th Cir. 2021) (quoting *Karels

v. Storz*, 906 F.3d 740, 747 (8th Cir. 2018)).  In such a "rare 'obvious case' . . . the unlawfulness

of the officer's conduct is sufficiently clear even though existing precedent does not address

similar circumstances." *Quraishi v. St. Charles Cty., Mo.*, 986 F.3d 831, 835 (8th Cir. 2021)

(quoting *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018)).

Unable to point to cases with similar facts, Aldridge argues instead that this case falls into the category of "rare obvious cases," and claims that he does not need to find an "exact match" because "a robust consensus of persuasive authority . . . clearly established that Officer Olsten violated Aldridge's First and Fourth Amendment constitutional rights."  Doc. 134 at p. 16. According to Aldridge, the "critical question is whether it was clearly established on September 29, 2017, that a police officer would violate the First and Fourth Amendments by gratuitously pepper spraying an individual who was not resisting arrest, not breaking any laws, but was merely protesting the police in a non-violent and non-threatening manner."  *Id.*

On the facts here—explained in detail above—the Court finds that this was not a "rare obvious case" where the constitutional question is "beyond debate."  *See Quraishi*, 986 F.3d at 835; *MacKintrush*, 987 F.3d at 770.  And further, Aldridge's description of the "critical question," as he puts it, is not particularized to the facts of this case and is at a high level of generality.  Aldridge himself may not have been "resisting arrest," or shouting threats like Brandy and other protesters, but the similarities to Aldridge's cited cases end there.  On the facts here, an officer's use of pepper spray in these circumstances was not, as Aldridge claims, a "gratuitous and completely unnecessary act of violence[.]"  Doc. 134 at p. 17 (citing *Tatum v. Robinson*, 858 F.3d 544, 550 (8th Cir. 2017)).  And the situation an officer in Aldridge's position faced here is unlike *Treats v. Morgan*, 308 F.3d 868, 874–75 (8th Cir. 2002), which involved an officer pepper spraying a lone inmate who posed no threat.  Aldridge's other cases likewise are not particularized to the facts of this case—indeed, Aldridge himself does not claim otherwise, since he relies on the "rare obvious case" exception.  Doc. 134 at pp. 15–16.

In addition to the Court's conclusion that the officer's use of force in this situation was not objectively unreasonable, and that a constitutional violation did not occur, Aldridge has not met his burden to show that the right was clearly established.

### 2.     First-Amendment-retaliation claim—use of force

The Court next considers Olsten's claim of qualified immunity from Aldridge's § 1983 First-Amendment-retaliation claim.  Aldridge alleges that Officer Olsten violated his First Amendment rights by "interfering with [his] ability to associate freely in public and express [his] views as part of a peaceful demonstration."  Doc. 37 at p. 16.  As with his alleged injuries, other than stating that he "went silent," Doc. 144 at p. 19, Aldridge leaves the summary-judgment record devoid of what happened after Olsten pepper sprayed him.

"[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out."  *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)) (alteration in original).  "To establish a First Amendment retaliation claim under 42 U.S.C. § 1983, the plaintiff must show (1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity."  *Id.* (*quoting Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)).

Here, like his Fourth-Amendment claim, Aldridge bases his First-Amendment-retaliation claim on an allegation of excessive force by Officer Olsten.  Doc. 134 at pp. 11–12.  For that reason, the Court's analysis above regarding Aldridge's Fourth-Amendment claim applies to his First-Amendment claim as well.  Aldridge similarly portrays himself as "peacefully protesting" and "not acting in a threatening or violent manner" while claiming that Officer Olsten pepper

sprayed him "in a gratuitous and punitive manner for exercising his First Amendment rights." Doc. 134 at p. 12.  But because the Court concludes that, under the totality of the circumstances, Officer Olsten's use of pepper spray was objectively reasonable, Aldridge's claim under the First Amendment also fails.

Further, Defendants argue that Aldridge's First-Amendment-retaliation claim against Commissioner Hayden, Count 1, fails because Aldridge does not claim that Hayden was personally involved.  Doc. 122 at pp. 11–12 (citing *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990)).  "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). Implicitly conceding summary judgment on the claim, Aldridge does not respond to this argument, and instead focuses on Count 7, his separate Fourth-Amendment failure-to-intervene claim against Hayden, which the Court turns to now.  Doc. 136 at pp. 21–22.

### 3.    Failure to intervene

Commissioner Hayden argues that qualified immunity shields him from both of Aldridge's § 1983 claims.  Aldridge counters that Commissioner Hayden "utterly failed in his duty to supervise and intervene, and Olsten's assault on Aldridge was the obvious result of that lack of intervention."  Doc. 136 at p. 22.

"To prove his failure to intervene claim, plaintiff must show that a[n] . . . officer used excessive force, that the other officers had knowledge of that excessive force, and that the other officers had a reasonable opportunity to intervene to prevent the use of excessive force."  *Taylor v. Spitzer*, No. 1:10-CV-9 SNLJ, 2011 WL 5827794, at *6 (E.D. Mo. Nov. 18, 2011) (citing *Putman v. Gerloff*, 639 F.2d 415, 423 (8th Cir. 1981)).

The Court's determination that Officer Olsten did not employ excessive force when he pepper sprayed the protesters necessarily means that Aldridge's failure-to-intervene claim against Commissioner Hayden fails.  *See Zubrod v. Hoch*, 907 F.3d 568, 580 (8th Cir. 2018) (stating that "a failure-to-intervene claim may not prevail in the absence of a showing of excessive force" (citing *Hicks v. Norwood*, 640 F.3d 839, 843 (8th Cir. 2011))).

### B.    Municipal liability

The Court next turns to Aldridge's municipal-liability claims against the City.  A municipality cannot be held liable under 42 U.S.C. § 1983 on a respondeat superior theory—that is, a municipality cannot be held liable solely because it employs a tortfeasor.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise.  *Id.* at 690–91; *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–89 (1989).  "It follows that, absent a constitutional violation by a city employee, there can be no § 1983 or *Monell* liability for the City."  *Whitney v. City of St. Louis, Mo.*, 887 F.3d 857, 861 (8th Cir. 2018) (citing *Malone v. Hinman*, 847 F.3d 949, 955 (8th Cir. 2017) ("Because we conclude that Officer Hinman did not violate Malone's constitutional rights, there can be no § 1983 or *Monell* liability on the part of Chief Thomas and the City."); *Sitzes v. City of W. Memphis, Ark.*, 606 F.3d 461, 470 (8th Cir. 2010) (agreeing with district court that plaintiffs' claims "could not be sustained absent an underlying constitutional violation by the officer"); *Sanders v. City of Minneapolis, Minn.*, 474 F.3d 523, 527 (8th Cir. 2007) ("Without a constitutional violation by the individual officers, there can be no § 1983 or *Monell* . . . municipal liability.")).

Such is the case here.  Absent a constitutional violation on the part of Officer Olsten, the City has no *Monell* liability.

## C.      Aldridge's state-law claims

Aldridge's remaining claims (Counts 3, 4, 5, and 8) sound only in state law. A district court may exercise supplemental jurisdiction over state-law claims that form part of the "same case or controversy" as claims over which the court has original jurisdiction.  28 U.S.C. § 1367(a).  However, "[a] district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . .").

Here, the Court grants summary judgment to Defendants on all claims over which it had original jurisdiction.  The Court declines to exercise supplemental jurisdiction over Aldridge's remaining state-law claims. *See Gregoire v. Class*, 236 F.3d 413, 420 (8th Cir. 2000) ("[T]he judicial resources of the federal courts are sparse compared to the states. We stress the need to exercise judicial restraint and avoid state law issues wherever possible." (quoting *Condor Corp. v. City of St. Paul*, 912 F.2d 215, 220 (8th Cir. 1990))).

## D.      Olsten's crossclaim

The Court finally turns to Officer Olsten's amended crossclaim against the City.  Doc. 107.  Olsten claims he "is entitled to future defense and indemnification from Crossclaim Defendant City of St. Louis and reimbursement of his attorneys' fees accrued to date."  Doc. 117 at p. 2.  Olsten moves for summary judgment on his crossclaim, contending that City of St. Louis Ordinance § 3.10.040(H), SLMPD Special Order 3-05, §XXII(A), and Mo. Rev. Stat. §

590.502(7) each obligate the City to defend and indemnify him in the current suit.  Doc. 118 at p.

12–14.  The City filed a motion to dismiss Olsten's crossclaim, Doc. 125, and also filed a

memorandum opposing Olsten's motion for summary judgment on the crossclaim, Doc. 132.

In light of the City's lawsuit in state court challenging Mo. Rev. Stat. § 590.502 on state

constitutional grounds, *see* Doc. 126-1, Olsten and the City agree that the Court should not

address Olsten's defense-and-indemnification argument based on that statute.  Docs. 126, 138.

However, Officer Olsten asks the Court to proceed with ruling on his motion for summary

judgment based on his two other arguments relating to Ordinance § 3.10.040(H) and SLMPD

Special Order 3-05, §XXII(A), Doc. 138, while the City moves to dismiss the crossclaim

entirely.  Doc. 125.

For the same reasons regarding Aldridge's state-law claims, the Court declines to

exercise supplemental jurisdiction over Olsten's crossclaim, which raises purely issues of state

and local law.

## IV.  Conclusion

Accordingly, the Court grants in part, and denies in part, Defendant Olsten's [117]

Motion for Summary Judgment and Defendants City of St. Louis and Commissioner Hayden's

[120] Motion for Summary Judgment, as follows:

The Court grants summary judgment for Defendant Olsten on Counts 1 and 6 of

Aldridge's Second Amended Complaint.  The Court grants summary judgment for the City of St.

Louis on Count 2.  The Court grants summary judgment for Commissioner Hayden on Counts 1

and 7.  The Court denies the motions for summary judgment in all other respects.

The Court declines to exercise supplemental jurisdiction over Aldridge's state-law

claims, and thus dismisses Counts 3, 4, 5, and 8 without prejudice.  The Court also declines to

exercise supplemental jurisdiction over Olsten's state-law crossclaim, and dismisses Olsten's crossclaim without prejudice.  The Court denies as moot the City's [125] Motion to Dismiss the crossclaim.  A separate judgment accompanies this Memorandum and Order.

So Ordered this 31st day of March 2022.

STEPHEN R. CLARK
UNITED STATES DISTRICT JUDGE